# Illinois Official Reports

## Supreme Court

---

### *People v. Allen*, 2015 IL 113135

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES E. ALLEN, Appellant. |
| Docket No. | 113135 |
| Filed | May 21, 2015 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Nicholas Ford, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy Defender, and Brian A. McNeil, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant. |
| | Lisa Madigan, Attorney General, of Springfield, and Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michele Grimaldi Stein and Brian K. Hodes, Assistant State's Attorneys, of counsel), for the People. |

Justices        CHIEF JUSTICE GARMAN delivered the judgment of the court, with opinion.

Justices Freeman, Kilbride, Burke, and Theis concurred in the judgment and opinion.

Justice Thomas dissented, with opinion, joined by Justice Karmeier.

## OPINION

¶ 1      Defendant James Allen was convicted of murder and armed robbery for the August 1, 1984, shooting death of Robert Ciralski, Sr. In 2009, defendant filed a *pro se* postconviction petition, alleging actual innocence and raising constitutional issues related to his claim of innocence, chiefly that the State suborned perjury and coerced confessions. He attached to his petition an unnotarized statement, styled as an affidavit. The statement indicated its writer was Robert Langford, and the author took responsibility for Ciralski's murder, stating that Allen had no involvement at all.

¶ 2      The circuit court of Cook County dismissed the petition, finding it frivolous and patently without merit. The court noted that the statement was unnotarized and listed additional reasons for dismissal. The appellate court affirmed the dismissal for lack of notarization. We granted defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2013). For the reasons that follow, we reverse the judgments of the appellate court and the circuit court.

¶ 3                                  BACKGROUND

¶ 4      Around 10 p.m. on August 1, 1984, Robert Ciralski, Sr., closed his liquor and grocery store for the night. As he exited, he stopped to talk to a police officer he knew in the neighborhood. He then got in his car and drove home, where his wife and son, Robert Jr., were waiting. As Ciralski parked the car and started to get out, he was attacked. His attacker shot him once in the shoulder and once in the forehead, killing him.

¶ 5      The disturbance drew Ciralski's wife and 14-year-old son to the window. His son yelled at two men he saw standing near Ciralski's car and, seeing the flash of a shiny object in one man's hand, fired one shot at them with a handgun. The two fled. Ciralski's family ran down to the car, where he was sprawled across the front seat. Ciralski's pants pocket was ripped open, and his belongings were scattered. Police and an ambulance arrived shortly thereafter. Efforts to revive Ciralski failed.

¶ 6      In late November 1985, Chicago Police Detective Michael Pochordo received a telephone call regarding Ciralski's murder. According to Pochordo, the anonymous caller told him that if he wanted to solve Ciralski's murder, he should look to the people who had committed the murder of Carl Gibson. Pochordo had investigated Gibson's murder, and defendant was one of several people convicted of murder for Gibson's death. Gibson's death was a contract killing; defendant was sentenced to natural life for driving the car in which his accomplices shot Gibson. A drug dealer named Charles Ashley had paid for Gibson's murder, on belief that Gibson was a police informant.

¶ 7      From investigating Gibson's murder, Pochordo was already familiar with defendant and an informant named Darryl Moore. Pochordo first spoke to Moore and elicited several details:

that Moore had arranged the contract killing of Ciralski; that defendant had followed Ciralski the night of his murder; and that two other men, Franklin Freeman and Henry Griffin, had gotten out of defendant's car to carry out Ciralski's murder. Griffin was already on death row for the murder of Gibson. See *People v. Griffin*, 148 Ill. 2d 45 (1992). Pochordo began looking for Freeman, who was located in Rockford. He arranged to speak to defendant at Stateville Correctional Center on December 9, 1985.

¶ 8 Pochordo told defendant he had certain information linking him to Ciralski's murder. Pochordo indicated an informant had told him that defendant participated in the contract murder of Ciralski on behalf of two drug dealers, Charles Ashley and Willie "Flukey" Stokes. Ashley and Stokes solicited Ciralski's murder because Ciralski had cut back on sales of quinine to drug dealers on the south side of Chicago. Quinine was used to dilute the heroin sold to users; this reduced its potency and gave the dealers more volume to sell. Ciralski had sold quinine from his store at 58th Street and Indiana Avenue. Defendant had carried out the murder with Henry Griffin and a third person. As Pochordo related this narrative, defendant indicated that Stokes had a contract out on defendant's life.

¶ 9 The evidence heard at trial conflicted on what happened next in that meeting. Pochordo testified that defendant told him his information was "basically correct," but that defendant would have to think about his family's safety and his own safety before agreeing to cooperate with the investigation. Nonetheless, Pochordo testified defendant provided the name of two additional drug dealers who had solicited Ciralski's murder, Harry Scott and Prentiss King. Defendant, on the other hand, testified that he gave Pochordo no information on that date; he knew nothing about the crime and denied involvement.

¶ 10 Pochordo and defendant next met in late December, when Pochordo brought along assistant State's Attorney Rick Beuke. Defendant did not initially cooperate in providing information to Beuke. Defendant testified at trial that Beuke then left the room so that he and Pochordo could talk alone. Defendant testified that Pochordo told him that this was his opportunity to help himself and avoid a death sentence like Henry Griffin's, and all he had to do was tell the truth. Defendant testified that when he asked what the truth was, Pochordo told him it was the narrative Pochordo had told him in their initial conversation. Defendant then relayed the story to Beuke.

¶ 11 Plea negotiations ensued over meetings and calls in the following weeks. Defendant asked for immunity from prosecution; this request was denied in part because defendant had previously been convicted of the murder of a police officer. Defendant agreed to testify against the others involved in the plot and to plead guilty to Ciralski's murder; in return, the State would seek a life sentence to run concurrently with the life sentence he was already serving for the murder of Carl Gibson. Defendant also received various accommodations, including a prison transfer for his protection and a few thousand dollars in assistance for the mother of his child. At the time the case went before the grand jury, it appeared that defendant would perform under the plea agreement. Defendant, Darryl Moore, and Franklin Freeman all testified about the contract on Ciralski's life. Defendant's grand jury testimony matched the narrative described above: four drug dealers hired defendant, Freeman, and Griffin to kill Ciralski for cutting back on quinine sales. The murder was to look like an armed robbery carried out at Ciralski's home, so as to conceal that it was in fact a drug-related contract connected to his business.

¶ 12    However, the agreement for defendant to testify for the State fell apart, and defendant went to trial in late August, 1987. No physical evidence linked defendant to the crime. The only witness to the occurrence to testify was Ciralski's son, who came to the window after his father had already been shot. He was not able to identify either of the men standing next to his father's car.[1] Defendant was convicted almost exclusively on the testimony of Detective Pochordo and Assistant State's Attorney Beuke, along with his own grand jury testimony. At trial, defendant disavowed his grand jury testimony. Testifying in his own defense, defendant indicated he simply repeated the story Pochordo had told him, first to Beuke and then to the grand jury. He fabricated embellishments where there were gaps. In support of his claim of a plan to lie, he testified at trial that before his grand jury testimony, he prepared a notarized statement indicating his plan to lie to the grand jury. He also sent letters to Scott and King, telling them that if they did not pay him $25,000, he would tell the grand jury they were involved in killing Ciralski. He indicated he had no knowledge whatsoever that Ciralski was involved in selling in quinine; he was impeached on this point by statements he made to police during the Carl Gibson murder investigation. In sum, defendant's overall defense was that he knew nothing about the Ciralski murder; he saw a chance for personal advantage in lying about the Ciralski murder, by getting considerations from the State's Attorney; and he wanted to expose Pochordo as a liar to help support his then-pending appeal in Gibson's murder.

¶ 13    The jury convicted defendant of first degree murder, armed robbery, and conspiracy to commit murder. Defendant was sentenced to natural life, to run consecutively to the natural life sentence he was already serving. The conspiracy conviction was vacated on appeal, but the conviction and sentence were otherwise affirmed.

¶ 14    On July 6, 2009, defendant filed his first postconviction petition. In it, he alleged actual innocence and constitutional violations, generally pertaining to his claim that the State suborned perjury to convict him and coerced confessions from him and his codefendants. He attached to that petition a signed statement, purporting to be from "Robert Langford A-01157" (Langford statement). The Langford statement certified that Langford was its author, and that the statement was made under penalty of perjury. It stated that Langford and a now-deceased accomplice followed Ciralski on the night of August 1, 1984, confronting him outside his home. Told to empty his pockets, Ciralski refused. "At that time I shot him and proceeded to take money from his pocket, several thousand dollars. Before we could search all his pockets someone inside the house he'd parked in front of called something out to us, then fired a gun shot from the house," the Langford statement claims. The Langford statement says Langford and his accomplice then fled to their car. "Mr. Ciralski was killed as a result of an armed robbery that went down badly. James Allen is innocent of the Robert Ciralski murder," the Langford statement concludes. The Langford statement is dated January 20, 2009. It is signed with Langford's name and prisoner number; it also has several attempted fingerprints at the bottom. The petition additionally claimed defendant's confession was coerced, that the State paid Moore and Freeman to lie under oath, that the State concealed exculpatory evidence in the

---

[1]Robert Ciralski, Jr., did make a tentative identification of a black and white photograph of defendant early in the investigation but said he was unsure. He was even less confident after seeing a color photograph of the defendant. In any event, the prosecution of defendant did not hinge on this identification; the State's theory was that defendant remained in the car down the block while Griffin and Freeman attacked Ciralski.

- 4 -

form of information linking Langford to the crime, and that the State knowingly used perjured testimony.

¶ 15    The circuit court dismissed the petition as frivolous and patently without merit, writing:

"At the outset, Langford's statement is not an affidavit since it is not a sworn statement and is not notarized. Langford does not even state that he would testify to these facts on behalf of petitioner. Moreover, petitioner has failed to explain how he acquired this statement and why he could not have obtained it sooner, especially since he specifically states that he heard of Langford from investigating officers. Finally, Langford's statement is hardly of such a conclusive character that it would change the result of petitioner's trial. Simply put, it is a one-page, bare-bones statement indicating that the victim was killed as the result of an attempted robbery and describes the route Langford purportedly drove in his car to commit the attempted robbery. Indeed, the statement is nothing more than a recitation of the most benign facts presented during petitioner's trial. As such, petitioner's claim fails."

¶ 16    As to defendant's constitutional claims, the circuit court noted that defendant's trial court found his confession was not coerced, noted that neither Moore nor Freeman testified in his trial, and noted that defendant himself knew of Langford's existence from his claim that police mentioned Langford during interrogation. The circuit court characterized defendant's claim that the State suborned perjury as conclusory in nature and unsubstantiated. Defendant appealed the first-stage dismissal.

¶ 17    The appellate court affirmed the dismissal due to the lack of notarization on the Langford statement. Noting that section 122-2 of the Post-Conviction Hearing Act requires the petitioner to attach "affidavits, records, or other evidence" in support of the petition's allegations, the appellate court found the unnotarized Langford statement would not qualify as an affidavit. *People v. Allen*, 2011 IL App (1st) 093438-U, ¶ 3. The appellate court also rejected an argument by defendant that, even if the Langford statement did not qualify as an affidavit, it would still qualify as "other evidence," reasoning that allowing a failed affidavit to qualify as "other evidence" would make the requirement of an affidavit surplus. *Id.* This court granted defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2013).

¶ 18                                    ANALYSIS

¶ 19    This case presents two questions for the court to resolve. The first question is whether lack of notarization of a petition's supporting evidence, styled as an affidavit, renders the petition frivolous or patently without merit, requiring dismissal at the first stage. The second question is whether defendant's petition is otherwise frivolous or patently without merit, such that summary dismissal on the first stage was required. We review a circuit court's dismissal of a postconviction petition *de novo*. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009).

¶ 20    The Post-Conviction Hearing Act provides a criminal defendant the means to redress substantial violations of his constitutional rights in his original trial or sentencing. *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002). Proceedings on a postconviction petition are collateral to conviction; "issues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*; issues that could have been raised, but were not, are considered waived." *Id.* at 456.

¶ 21 The Post-Conviction Hearing Act contains a three-stage procedure for relief. *People v. Boclair*, 202 Ill. 2d 89, 99 (2002). Within the first 90 days after the petition is filed and docketed, a circuit court shall dismiss a petition summarily if the court determines it is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2008). If the petition is not dismissed as being frivolous or patently without merit, the court then orders the petition to be docketed for further consideration. 725 ILCS 5/122-2.1(b) (West 2008). In the second stage, the defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Coleman*, 206 Ill. 2d 261, 277 (2002). Within 30 days of the court's order to docket a petition, the State must either move to dismiss or file an answer. 725 ILCS 5/122-5 (West 2008). At this stage, the court has discretion to allow amendment of the petition, "as shall be appropriate, just and reasonable and as is generally provided in civil cases." *Id.*

¶ 22 If the defendant has carried his burden to make a substantial showing of a constitutional violation throughout the second stage, the court advances the petition to the third stage. At the third stage, the court may receive "affidavits, depositions, oral testimony, or other evidence," to weigh the merits of the petition and determine whether the defendant is entitled to relief. 725 ILCS 5/122-6 (West 2008). Under Illinois law, "a claim of newly discovered evidence showing a defendant to be actually innocent of the crime for which he was convicted is cognizable as a matter of due process." *People v. Washington*, 171 Ill. 2d 475, 489 (1996). The supporting evidence for a petition on the basis of actual innocence must be "new, material, noncumulative and, most importantly, 'of such conclusive character' as would 'probably change the result on retrial.' " (Internal quotation marks omitted.) *Id.* (quoting *People v. Silagy*, 116 Ill. 2d 357, 368 (1987)).

¶ 23                                        First-Stage Review

¶ 24 In the case at bar, defendant's petition was dismissed at the first stage, as the circuit court found it to be frivolous and patently without merit. At the first stage, "the court considers the petition's substantive virtue rather than its procedural compliance." *People v. Hommerson*, 2014 IL 115638, ¶ 11. Most postconviction petitions are drafted by *pro se* defendants, and accordingly, the threshold for a petition to survive the first stage of review is low. *Hodges*, 234 Ill. 2d at 9. If a petition alleges sufficient facts to state the gist of a constitutional claim, even where the petition lacks formal legal argument or citations to authority, first-stage dismissal is inappropriate. *Id.* This low threshold does not excuse the *pro se* petitioner from providing factual support for his claims; he must supply sufficient factual basis to show the allegations in the petition are "capable of objective or independent corroboration." *People v. Collins*, 202 Ill. 2d 59, 67 (2002).

¶ 25 Where a petition presents " 'legal points arguable on their merits,' " it is not frivolous. *Hodges*, 234 Ill. 2d at 11 (quoting *Anders v. California*, 386 U.S. 738, 744 (1967)). A petition may be dismissed as frivolous or patently without merit only "if the petition has no arguable basis either in law or in fact"—relying on "an indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 16, 17. Meritless legal theories include ones completely contradicted by the record, while fanciful factual allegations may be "fantastic or delusional." *Id.* at 17. In evaluating the allegations in the petition, the circuit court must take them as true and construe them liberally. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). "[T]he Act does not authorize the dismissal of a post-conviction petition during the initial stage

based on untimeliness." *Boclair*, 202 Ill. 2d at 99. Our case law thus reveals a limited number of reasons for summary dismissal of a postconviction petition.

¶ 26 On the other hand, this court has allowed the summary dismissal of a postconviction petition for being substantially incomplete. The Post-Conviction Hearing Act requires both a verification affidavit and supporting evidence to be attached to the petition. 725 ILCS 5/122-1(b) (West 2008) (noting that a proceeding is commenced by the filing of "a petition *** verified by affidavit"); 725 ILCS 5/122-2 (West 2008) (stating that the "petition shall have attached thereto affidavits, records, or other evidence supporting its allegations"). Where the petition lacks "affidavits, records, or other evidence supporting its allegations," the petitioner must explain in his pleadings why that evidence is not attached. 725 ILCS 5/122-2 (West 2008). In *People v. Collins*, this court affirmed the first-stage dismissal of a petition with only one affidavit, reading " 'I, London Collins, a prisoner incarcerated in Tamms Minimum Security Unit, have read and understand the above Petition for Post Conviction Relief. All the facts presented are true and correct to the best of my recollection.' " *Collins*, 202 Ill. 2d at 62. The *Collins* court rejected the defendant's argument that his attached affidavit could serve as both verification affidavit and evidentiary affidavit, as sections 122-1 and 122-2 serve different purposes under the Act. The requirement for a verification affidavit in section 122-1, "like all pleading verifications, confirms that the allegations are brought truthfully and in good faith." *Id.* at 67. The requirement of an evidentiary affidavit or other evidence, "by contrast, shows that the verified allegations are capable of objective or independent corroboration." *Id.* The court acknowledged that the attachment of affidavits, records, or other evidence would sometimes place an "unreasonable burden" on postconviction petitioners, but noted that the defendant in that case was asking to be excused from not only "section 122-2's evidentiary requirements but also from section 122–2's pleading requirements." (Emphases omitted.) *Id.* at 68. Because the petitioner in *Collins* failed to attach evidence or to explain its absence, and with the absence of facts from which the court could reasonably infer an explanation, the court affirmed dismissal of the petition as frivolous and patently without merit. *Id.* at 69.

¶ 27 *Collins*, however, has not been this court's last word on the first-stage dismissal of a postconviction petition for incompleteness. In *People v. Hommerson*, the court considered whether a petition could be dismissed solely for lacking a verification affidavit. *Hommerson*, 2014 IL 115638. The court noted the purpose of the verification affidavit is to confirm that the allegations were brought " 'truthfully and in good faith.' " *Id.* ¶ 9 (quoting *Collins*, 202 Ill. 2d at 67). The court looked to its conclusion in *People v. Boclair* that the legislature had allowed for summary dismissal only where the petition was "frivolous or patently without merit," and placement of the timeliness provision in a separate subsection indicated timeliness was not a proper basis for summary dismissal. *Id.* ¶ 10 (citing *Boclair*, 202 Ill. 2d at 100). The court found that to allow dismissal for the absence of a verification affidavit would be "at odds with a first-stage determination of whether the petition's allegations set forth a constitutional claim for relief." *Id.* ¶ 11. Further, it would conflict "with our prior holdings that, at the first stage of proceedings, the court considers the petition's substantive virtue rather than its procedural compliance." *Id.* Rather than providing a basis for dismissal at the first stage, the lack of a verification affidavit could provide grounds for a challenge by the State at the second stage. *Id.*

¶ 28 The Langford Statement's Lack of Notarization

¶ 29    This case presents a fact pattern falling somewhere between *Hommerson* and *Collins*. As in both cases, the circuit court summarily dismissed in part because the petition was incomplete. Unlike both *Hommerson* and *Collins*, the petition was not missing an attachment altogether. The flaw at issue in this case does not concern the "brought truthfully and in good faith" purpose of the verification affidavit in *Hommerson*. (Internal quotation marks omitted.) *Hommerson*, 2014 IL 115638, ¶ 9. It instead concerns the "capable of objective or independent corroboration" purpose of the attached evidence in *Collins*. *Collins*, 202 Ill. 2d at 67.

¶ 30    The State has argued the lack of notarization renders the Langford statement a "nullity." The State relies chiefly on *Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490, 497 (2002). In *Roth*, the appellant filed a document entitled "Affidavit of Intent to File Petition For Leave to Appeal" with the court. *Id.* at 492. It was signed by the appellant's attorney, but it was not notarized or sworn. *Id.* at 494. At that time, Rule 315(b) required a party seeking additional time to appeal to timely "file with the Appellate Court an affidavit of intent to file a petition for leave, and file the petition within 35 days after the entry of such judgment." (Emphasis and internal quotation marks omitted.) *Id.* at 492-93. The court considered whether the "affidavit" required in Rule 315(b) would be satisfied by the attorney's signature alone. It considered the common usage of "affidavit" in cases within the state, noting it was generally " 'simply a declaration, on oath, in writing, sworn to by a party before some person who has authority under the law to administer oaths.' " *Id.* at 493 (quoting *Harris v. Lester*, 80 Ill. 307, 311 (1875)). The court rejected the appellant's argument that the affidavit's sole purpose was to provide notice of the party's intention to seek leave to appeal, for two reasons: (1) rules of the court hold the force of law, and litigants must have incentive to follow them; and (2) the affidavit of intent did more than give notice; it automatically stayed the mandate of the appellate court. These purposes militated in favor of the more exacting requirement of notarization. The *Roth* court concluded that Rule 315 affidavits require notarization, in part because Rule 315 did not provide any explicit requirements, so the common usage of the term "affidavit" would govern.The State cites *Roth* largely for its conclusion: an unsworn affidavit is a "nullity."

¶ 31    The Langford statement is styled as an affidavit, but it is not one. The Langford statement is captioned "AFFIDAVIT" and contains a signature. It contains an additional attempt to verify identity: the attempted affiant's thumbprint.[2] The Langford statement attests that Langford is the one making it. It states that Langford is making the statement subject to penalties of perjury, then recites various details of the crime. Yet the Langford statement is not an affidavit. An affidavit consists of a "statement sworn to before a person who has authority under the law to administer oaths." *Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490, 494 (2002). The question for this court is whether the lack of notarization on this statement renders the petition frivolous or patently without merit, or whether the Langford statement might otherwise qualify as sufficient evidence to survive the first stage.

¶ 32    When interpreting a statute, we must "consider the statute in its entirety, keeping in mind the subject it addresses and the apparent intent of the legislature in enacting it." *People v. Perry*, 224 Ill. 2d 312, 323 (2007). The evidentiary affidavit attached to a postconviction

---

[2]The State argues that the inclusion of a fingerprint under Langford's signature, on a line marked "SIGNEE'S RIGHT [obscured] PRINT," does not indicate that Langford attempted to verify or swear to the statement. We can conceive of no other reason to include it.

petition serves two purposes. First, it must contain a factual basis sufficient to show the petition's allegations are "capable of objective or independent corroboration." *Collins*, 202 Ill. 2d at 67. Second, it must "identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations." *People v. Delton*, 227 Ill. 2d 247, 254 (2008). As the State has argued, the purpose behind notarization is twofold: to verify the identity of the person signing the document and to ensure that person understands that he subjects himself to penalties of perjury in the statement. See *Vancura v. Katris*, 238 Ill. 2d 352, 387 (2010); *Loraitis v. Kukulka*, 1 Ill. 2d 533, 538 (1953) (noting the "superior effect" given to statements made under oath and applying penalties of perjury to affidavits). Each of these concerns focuses fundamentally on evidentiary reliability. The impact of these evidentiary concerns on the "capab[ility] of independent or objective corroboration" and the identification of "sources, character, and availability of the alleged evidence" would essentially be a question of whether the facts contained in the affidavit are *true*.

¶ 33    The summary dismissal provision has given rise to a specific body of case law that guides our analysis. The legislature intended that the circuit court at the first stage would look to whether the petition alleges a constitutional deprivation and whether petitioner's proffered evidence substantially indicates the availability of admissible evidence in support of his claim, in a way that can be corroborated through later proceedings. 725 ILCS 5/122-1, 122-2.1 (West 2008); *Collins*, 202 Ill. 2d at 67; *Delton*, 227 Ill. 2d at 254. At the first stage, the court considers solely the petition's *substantive* virtue, dismissing only where the petition is frivolous or patently without merit. *Hommerson*, 2014 IL 115638, ¶ 11; see 725 ILCS 5/122-2.1, 122-5 (West 2008). Not until the second stage is the petition subjected to adversarial testing through the State's involvement. 725 ILCS 5/122-5 (West 2008). There, the State can raise certain other defects, insofar as they represent a deficiency in the petition but do not render a petition frivolous or patently without merit. *Boclair*, 202 Ill. 2d at 101 (holding that allowing the circuit court to summarily dismiss for untimeliness would improperly expand the words "frivolous or *** patently without merit" (internal quotation marks omitted)); *Hommerson*, 2014 IL 115638, ¶ 11 (holding that the court's first-stage review of "substantive virtue" should not include compliance with the section 122-1(b) verification affidavit requirement). The State may challenge such "nonjurisdictional procedural defect[s]" at the second stage; failure to do so forfeits the issue. *People v. Cruz*, 2013 IL 113399, ¶¶ 21, 25 (holding that, like untimeliness, failure to notarize a verification affidavit can be forfeited); *Boclair*, 202 Ill. 2d at 101-02. Enforcing such requirements at the first stage would "frustrate[ ] the legislature's intent to provide incarcerated individuals with this avenue of redress." *Hommerson*, 2014 IL 115638, ¶ 12.

¶ 34    As a practical matter, this issue boils down to a determination of whether defendant, who filed a *pro se* petition that is accompanied by an unnotarized factual statement supporting the allegations in his petition, should be permitted to consult with an attorney regarding his constitutional claim and whether he should be given the opportunity to have counsel amend his petition before the State responds. Lack of notarization here does not prevent the court from reviewing the petition's "substantive virtue," as to whether it "set[s] forth a constitutional claim for relief." *Hommerson*, 2014 IL 115638, ¶ 11. Defendant's failure to notarize does not limit the Langford statement's identification of the "sources, character, and availability" of evidence alleged to support the petition, or destroy its ability to show that the petition's

allegations are capable of independent corroboration. *Delton*, 227 Ill. 2d at 254; *Collins*, 202 Ill. 2d at 67. Defendant's failure to notarize does not leave the petition with "no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 12. In sum, the Langford statement's lack of notarization does not make the petition frivolous or patently without merit. We find the circuit court may not dismiss at the first stage solely for failure to notarize a statement styled as an evidentiary affidavit. Instead, the circuit court at the first stage must look to whether the evidentiary attachments satisfy the purposes identified in *Collins* and *Delton*: showing that the petition's allegations are capable of corroboration and identifying the sources, character, and availability of evidence alleged to support the petition's allegations. As explained below, the Langford statement satisfies these purposes. While not an admissible affidavit in its present form, the Langford statement properly qualifies as "other evidence." 725 ILCS 5/122-6 (West 2008).

¶ 35        The defendant is not entirely absolved from the notarization requirement of *Roth*, however. Where a defendant has submitted an unnotarized statement, the State may challenge this nonjurisdictional procedural defect at the second stage of proceedings. 725 ILCS 5/122-5 (West 2008) (providing that, where a petition is not dismissed at the first stage, the State has 30 days to "answer or move to dismiss"); see, *e.g.*, *Boclair*, 202 Ill. 2d at 102 (finding "the matter of untimeliness should be left for the State to assert during the second stage of the post-conviction proceedings"). Where a defendant's postconviction counsel is unable to obtain a properly notarized affidavit, the court may dismiss the petition upon the State's motion. See 725 ILCS 5/122-5 (West 2008) (granting the court discretion to allow amendment of the petition "as shall be appropriate, just and reasonable and as is generally provided in civil cases").

¶ 36        Relying on the canon against surplusage, the State argues that considering the Langford statement as "other evidence" renders the word "affidavit" surplus. See 725 ILCS 5/122-2 (West 2008). Further, the State argues, the Langford statement is inadmissible hearsay, such that it cannot qualify as other evidence. We do not agree. The use of "other evidence" in the phrase "affidavits, records, or other evidence" indicates the legislature contemplated a wide range of documentary evidence would satisfy the evidentiary requirements of the first stage. 725 ILCS 5/122-2 (West 2008). That the legislature would accept an explanation for failure to attach evidence in lieu of such evidence further indicates legislative intent that petitions with substantive merit would advance to the second stage, even where the evidence attached suffers from remediable procedural defects. *Id.* The word "affidavit" is not rendered surplus: a defendant still has ample reason to obtain a properly notarized affidavit. First-stage notarization would prevent the State from raising that issue in a second-stage challenge. First-stage notarization also would eliminate any risk that postconviction counsel would be unable to get the statement notarized and would focus postconviction counsel's resources on substantive improvements to the petition. Because an affidavit remains sufficient and in some ways superior for first-stage purposes, the word "affidavit" is not rendered surplus by accepting a signed statement as "other evidence."

¶ 37        Nor are we persuaded by the State's arguments that all such "other evidence" must be competent, admissible evidence at the time attached to the petition. Were this the case, postconviction petitioners would be subjected at the first stage to the requirements for authentication of documents and qualification of expert witnesses who might testify, or to satisfactorily prove a chain of custody for physical evidence. See Ill. R. Evid. 702, 901; see,

*e.g.*, *Van Hattem v. K mart Corp.*, 308 Ill. App. 3d 121, 135 (1999) (requiring evidence's proponents to show "that it was reasonably probable the evidence remained unchanged in any important respect or was not substituted"). Such inquiries are incompatible with the first stage's abbreviated review. It is enough for first-stage purposes that the defendant has provided substantive evidentiary content showing his claims are capable of corroboration and independent verification. The contrary view would allow a postconviction petition that is neither frivolous nor patently without merit, but supported only by an unnotarized factual statement, to be denied substantive review simply because the petitioner did not have access to a notary. Further, under *Collins*, defendant's petition would have advanced to the second stage, as long as he explained that Langford had authored the statement supporting the allegations in the petition but that the statement could not be notarized due to the lack of a notary. It is difficult to understand how an explanation of the difficulty of finding a notary within the prison—a difficulty the court can readily surmise—would convert the instant petition from being frivolous or patently without merit to being potentially meritorious. Indeed, such an explanation would be entirely unrelated to whether the petition relies on legal theories completely contradicted by the record or factual allegations that are "fantastic or delusional." *Hodges*, 234 Ill. 2d at 12, 16-17.

¶ 38    The dissent expresses concern that our ruling will cause a flood of frivolous second-stage postconviction proceedings. *Infra* ¶ 77. We note, first, that the court may dismiss a petition where it is frivolous or patently without merit. Those petitions containing assertions without an arguable basis in fact or law will be filtered at the first stage. Second, where postconviction counsel is unable to remedy the lack of notarization of an attached statement, dismissal at the second stage is appropriate—filtering out forgeries. Third, the dissent's fear of an overwhelming number of frivolous second-stage proceedings is equally applicable to this court's decision in *Boclair*, wherein we held that timeliness was not an appropriate ground to dismiss at the first stage. *Boclair*, 202 Ill. 2d at 99. We are unaware of a flood of frivolous second-stage proceedings stemming from that decision. *Boclair* so held because the legislature limited first-stage dismissal to two reasons: the petition is frivolous or patently without merit. *Id.* at 100-01. Because we conclude the lack of notarization does not render defendant's petition to be frivolous or patently without merit, we reach the same result.

¶ 39                      Whether Defendant's Petition Is Otherwise Frivolous

¶ 40    The circuit court first noted the Langford statement was not an affidavit "since it is not a sworn statement and is not notarized." The appellate court affirmed solely on that basis, which we have now rejected. The circuit court made additional observations that might present a basis to dismiss:

> "Langford does not even state that he would testify to these facts on behalf of petitioner. Moreover, petitioner has failed to explain how he acquired this statement and why he could not have obtained it sooner, especially since he specifically states that he heard of Langford from investigating officers. Finally, Langford's statement is hardly of such a conclusive character that it would change the result of petitioner's trial. Simply put, it is a one-page, bare-bones statement indicating that the victim was killed as the result of an attempted robbery and describes the route Langford purportedly drove in his car to commit the attempted robbery. Indeed, the statement is nothing more

than a recitation of the most benign facts presented during petitioner's trial. As such, petitioner's claim fails."

¶ 41 The circuit court is correct in noting the Langford statement does not indicate he would testify to the facts therein. However, on the first stage of review, the court is to take the allegations of the petition as true and construe them liberally. *Edwards*, 197 Ill. 2d at 244. At this point, the court might infer that Langford was willing to provide the statement but not testify, or it might infer that Langford was willing to provide the statement and to testify. We believe the latter inference is consistent with the directive to construe the petition's allegations liberally.

¶ 42 The State has echoed the circuit court's reasoning, in that evidence at trial revealed defendant knew Langford's name and potential involvement even back in 1985. Yet there seems to us to be a gulf between knowing a person's name and that he may have been involved, and having a signed confession from that person in hand. There are ample conceivable reasons for the delay. Both defendant and Langford are incarcerated, limiting their ability to contact each other. Likewise, an individual who has committed a murder is presumably reluctant to confess to it. On the record before us, we cannot conclude defendant "was armed with this information at the time of trial" or that it clearly "could have been discovered sooner." See *People v. Harris*, 206 Ill. 2d 293, 301 (2002). In any event, the circuit court's role at this point is not to speculate reasons for dismissal; it is to dismiss only if the petition presents "no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 12. To be sure, there has been a long delay between defendant's conviction and the Langford statement, more than two decades. However, at this early stage in the postconviction proceedings, there is no indication the Langford statement should have been available to defendant sooner. Further, "the Act does not authorize the dismissal of a post-conviction petition during the initial stage based on untimeliness." *Boclair*, 202 Ill. 2d at 99. This issue requires more factual development.

¶ 43 The circuit court found the Langford statement to be "a one-page, bare-bones statement" and "nothing more than a recitation of the most benign facts presented during petitioner's trial." The attached evidence must only show the petition's allegations are "capable of objective or independent corroboration," *Collins*, 202 Ill. 2d at 67, and "identify with reasonable certainty the sources, character, and *availability* of the alleged evidence supporting the petition's allegations." (Emphasis added.) *Delton*, 227 Ill. 2d at 254. We conclude that under the forgiving standards of the first stage, the Langford statement meets these requirements. There are aspects of the Langford statement that conflict with the testimony heard at trial. Obviously, it conflicts with defendant's own grand jury testimony, in which defendant admitted following Ciralski to his home so that Griffin and Freeman could kill Ciralski. The Langford statement indicates Langford shot Ciralski and took "several thousand dollars" from his pockets. At trial, a police detective testified a store employee said Ciralski would have been carrying the day's proceeds of only $1,100 to $1,500, and Ciralski's family indicated that more than $1,000 was turned over to them from Ciralski's body, at the hospital. Notably, the Langford statement describes Ciralski's store as being at "the southeast corner of 57th Street and Indiana," while all the testimony at trial indicated the store was located at 58th Street and Indiana Avenue.

¶ 44 The Langford statement also contains elements consistent with the testimony at trial. The route described in the Langford statement matches the route defendant described in his grand

- 12 -

jury testimony. Two individuals confronted Ciralski as he was exiting his car, in accordance with Robert Ciralski, Jr.'s testimony that two men were standing near the car. Ciralski's killers shot him, then rifled through his pockets, in accordance with officers' testimony as to the crime scene. Someone in Ciralski's house fired a gun at Ciralski's killers, and the killers fled on foot to their car, in accordance with Robert Ciralski, Jr.'s testimony. Overall, the Langford statement is consistent with defendant's testimony at trial and overall theory of the case: that defendant was uninvolved and only parroted what Detective Pochordo had already told him, embellishing his account with details he thought were credible.

¶ 45    The circuit court's consideration that the Langford statement lacked "conclusive character" essentially weighed the credibility of defendant's petition and the Langford statement against defendant's prior grand jury testimony, the testimony of Detective Pochordo, and the testimony of assistant State's Attorney Beuke. This analysis constituted a more probing inquiry than what is contemplated on first-stage review, where dismissal is appropriate only if "the petition has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 12. These strengths and weaknesses are best tested in the second or third stages of postconviction review.

¶ 46    Accordingly, we reverse and remand for second-stage proceedings.

¶ 47                                    CONCLUSION

¶ 48    The Langford statement, while subject to challenge at the second stage for lack of notarization, qualifies as other evidence for first-stage postconviction review. The circuit court's alternative reasons to dismiss the postconviction petition constituted greater scrutiny than the first stage involves. The judgment of the appellate court is reversed. The judgment of the circuit court is reversed.

¶ 49    Reversed and remanded.

¶ 50    JUSTICE THOMAS, dissenting:

¶ 51    The facts of this case do not, as the majority asserts, fall "somewhere between *Hommerson* and *Collins*." *Supra* ¶ 29. On the contrary, the facts of this case fall squarely within *Collins*, and consequently defendant's petition in this case deserves the same fate as that in *Collins*: summary dismissal. The appellate court's decision below therefore should be affirmed, and for this reason I dissent.

¶ 52    Titled "Contents of Petition," section 122-2 of the Post-Conviction Hearing Act expressly states that a postconviction petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2012). In *Collins*, the defendant filed a *pro se* postconviction petition that, "[c]ontrary to the clear mandate of section 122-2 of the Act, defendant's petition was unsupported by 'affidavits, records, or other evidence' and offered no explanation for the absence of such documentation." *Collins*, 202 Ill. 2d at 66 (quoting 725 ILCS 5/122-2 (West 2000)). The trial court summarily dismissed the *pro se* petition, and this court affirmed. In doing so, this court explained that the failure to comply with section 122-2 is "fatal" to a postconviction petition and "alone justifies" summary dismissal. *Id.*

¶ 53    Here, there is absolutely no question that defendant failed to comply with section 122-2. Indeed, the only thing attached to defendant's *pro se* petition was a piece of paper containing a

statement purporting to be from a man named Robert Langford. Though captioned "affidavit," the statement was not made under oath, was not sworn to before a person who has authority under the law to administer oaths, and was not notarized. Consequently, rather than being an "affidavit," the piece of paper attached to defendant's postconviction petition was a complete "nullity" that had absolutely "no legal effect." *Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490, 497 (2002) (holding that an unsworn affidavit is a nullity that has no legal effect). In other words, just like the petition in *Collins*, defendant's petition here was supported by precisely nothing. Given this, the trial court below was correct to dismiss defendant's petition summarily, and the appellate court was correct to affirm that dismissal.

¶ 54    The majority reaches the opposite conclusion. According to the majority, the trial court below erred in summarily dismissing defendant's *pro se* petition because, although the unsworn Langford statement does not constitute an "affidavit," it does constitute "other evidence" for purposes of the Act. *Supra* ¶ 34. In reaching this result, the majority explains that section 122-2's evidentiary affidavit requirement serves two important purposes: (1) to show that the petition's allegations are capable of independent or objective corroboration; and (2) to identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations. *Supra* ¶ 32. Thus, the majority explains, the critical question is not whether an "unsworn factual statement" is an affidavit, nor even whether such a statement is admissible (*supra* ¶ 34). Rather, the critical question is whether the "unsworn factual statement" satisfies the two purposes identified above. If it does, then the "unsworn factual statement" constitutes "other evidence" for purposes of section 122-2, whatever its "remediable procedural defects." *Supra* ¶ 36. As to the unsworn Langford statement specifically, although the majority concedes that the statement is not only not an affidavit but also inadmissible (*supra* ¶ 34), the majority nevertheless concludes that the statement constitutes "other evidence" for purposes of the Act because failure to notarize does not "limit" or "destroy" an unsworn statement's ability to serve the purposes of an evidentiary affidavit. *Supra* ¶ 34.

¶ 55                                                   "Other Evidence"

¶ 56    There are numerous problems with the majority's analysis. First and foremost is the majority's conclusion that, despite being unsworn, the Langford statement nevertheless is "other evidence" that "satisf[ies] the purposes" of section 122-2's evidentiary affidavit requirement. This court could not have been any clearer in *Roth*: an affidavit that is not sworn is "a nullity" that has "no legal effect." *Roth*, 202 Ill. 2d at 497. Thus, under *Roth*, the unsworn Langford statement not only cannot satisfy the purpose of section 122-2's evidentiary affidavit requirement, it cannot satisfy *any* legal purpose. Given this, the majority's conclusion to the contrary amounts to an outright overruling of *Roth*. Prior to today, an unsworn affidavit was "a nullity" with "no legal effect." After today, an unsworn affidavit is "evidence" on par with affidavits, records, evidence depositions, and oral testimony. See *infra* ¶ 61. Indeed, according to the majority, the fact that the unsworn Langford statement is unsworn neither "limits" nor "destroys" that statement's ability to "satisfy the purposes" of an evidentiary affidavit. *Supra* ¶ 34. In other words, according to the majority, an "unsworn factual statement" is no less effective at satisfying the purposes of an evidentiary affidavit than an actual evidentiary affidavit is. This is a complete inversion of our affidavit jurisprudence, and the majority offers no explanation to justify its radical departure from *stare decisis* on this point.

¶ 57        And lest there be any thought that perhaps *Roth* was either misguided or shortsighted in its conclusion concerning the impotency of unsworn statements, this case provides all the confirmation one needs that *Roth* was emphatically correct on this point. Again, according to the majority, an "unsworn factual statement" constitutes "other evidence" for purposes of the Act if it (1) shows that the petition's allegations are capable of independent or objective corroboration; and (2) identifies with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations. *Supra* ¶ 32. Or to put it another way, "[i]t is enough for first-stage purposes that the defendant has provided substantive evidentiary content *showing* his claims are capable of corroboration and independent verification." (Emphasis added.) *Supra* ¶ 37. The question I have, and the one the majority nowhere answers, is how can an unsworn factual statement possibly "show" or establish "with reasonable certainty" either of these things? Indeed, as the majority concedes, the whole point of having an affidavit sworn to under oath is "to verify the identity of the person signing the document and to ensure that person understands that he subjects himself to penalties of perjury in the statement." *Supra* ¶ 32. The obvious corollary to this is that, with respect to a statement that is *not* sworn to under oath, neither of these purposes is served—the identity of the declarant remains unverified, and the risk of perjury is nonexistent. And this is precisely why an unsworn affidavit is a "nullity" having "no legal effect." Indeed, what possible foundation does the majority have for concluding, or even presuming, that the unsworn Langford statement was in fact drafted and signed by Langford? There is absolutely nothing on the face of that statement to either "show" or establish "with reasonable certainty" that this is the case. As for the perjury piece, even if an unsworn statement states, as the unsworn Langford statement does, that the declarant understands that he or she is subject to the penalties of perjury, in fact the declarant is *not* subject to the penalties of perjury because *the statement is unsworn*. That's the point, and the one the majority seems to miss. The bottom line is that "unsworn factual statement" is just another way of saying "hearsay." And it is beyond well-settled that hearsay is "generally inadmissible due to its lack of reliability." *People v. Olinger*, 176 Ill. 2d 326, 357 (1997). An inadmissible and unreliable statement cannot "show" or establish "with reasonable certainty" *anything*. Thus, even assuming that the majority has correctly defined the test for establishing whether something is "other evidence" under the Act, the unsworn Langford statement fails that test miserably.

¶ 58        At this point, it is worth recalling this court's decision in *Secura Insurance Co. v. Illinois Farmers Insurance Co.*, 232 Ill. 2d 209 (2009). In *Secura*, the plaintiff's notice of appeal was received by the circuit court outside the 30-day appeal period, and there was no affidavit or certificate of mailing in the record stating that the notice of appeal had been timely filed. *Id.* at 212. After initially granting the defendant's motion to dismiss the plaintiff's appeal for lack of jurisdiction, the appellate court allowed the plaintiff to supplement the record with a cover letter that the plaintiff had sent to the circuit court and that was dated on the final day of the 30-day filing period. *Id.* In this court, the issue was whether that letter was sufficient evidence to establish that the notice of appeal was timely. In holding that it was not, this court explained that, under the relevant rules, proof of mailing must be either by a certificate of attorney or by affidavit. *Id.* at 215-16. The court then explained that, for obvious reasons, the plaintiff's letter to the clerk constituted neither of these things:

           "The letter does not contain an affidavit or a certificate and nothing is certified or sworn to. The cover letter contains only a date, which, at best, indicates that it may have been

- 15 -

mailed on that date. This is simply insufficient for purposes of the rule." (Emphases omitted.) *Id*. at 216.

At that point, and of particular relevance to the present case, the court emphasized that "the record, having been supplemented with the cover letter, *offers no more certainty concerning the timeliness of the notice than it did before the cover letter became part of the record*." (Emphasis added.) *Id*. In other words, according to *Secura*, the evidentiary value of filing an "unsworn factual statement" where an affidavit is required is precisely zero. Indeed, the legal consequence is exactly the same as filing *nothing at all*, which is exactly what I argued above and exactly what *Roth* compels.

¶ 59    But even if this were not the case, the majority's conclusion that the unsworn Langford statement constitutes "other evidence" would remain incorrect because that conclusion is wholly foreclosed by the plain language of the Act. Under our well-settled rules of statutory construction, "[w]here a word is used in different sections of the same statute, the presumption is that the word is used with the same meaning throughout the statute, unless a contrary legislative intent is clearly expressed." *People v. Maggette*, 195 Ill. 2d 336, 349 (2001). The phrase "other evidence" appears twice in the Act. It appears first in section 122-2, which is the section at issue in this case and which states that the petition when filed must have attached to it "affidavits, records, or other evidence supporting its allegations." 725 ILCS 5/122-2 (West 2008). The phrase next appears in section 122-6, which, among other things, states that the trial court in a postconviction proceeding "may *receive proof* by affidavits, depositions, oral testimony, *or other evidence*." (Emphases added.) 725 ILCS 5/122-6 (West 2008). Thus, under the plain language of the Act, "other evidence" refers to something that can be used *to prove* contested facts to the court. In other words, "other evidence" means other *admissible* evidence, because of course only *admissible* evidence can be used to prove contested facts to the court. This is important because, as an "unsworn factual statement," the unsworn Langford statement is wholly inadmissible and therefore incapable of proving anything, a point the majority readily concedes. *Supra* ¶ 34. That being the case, the unsworn Langford statement is clearly not "other evidence" under section 122-6, which means it also is not "other evidence" under section 122-2, as we must presume that the phrase "other evidence" means the same thing in both provisions. Conversely, were we to say, as the majority does, that the unsworn Langford statement constitutes "other evidence" under section 122-2, then we would also have to say, under our settled canons of construction, that the unsworn Langford statement is "other evidence" under section 122-6. But this cannot be, as to say this would be to say that a defendant may prove contested facts in a postconviction proceeding though the use of "unsworn factual statements," a principle the majority surely does not wish to establish. No, the proper and consistent reading of the statute is to say that, under the plain language of section 122-6, "other evidence" means other *admissible* evidence. Indeed, given the Act's plain language, it can mean no other thing. Consequently, under our settled canons of construction, "other evidence" must mean the same thing when used in section 122-2. The unsworn Langford statement therefore is not "other evidence," and defendant's *pro se* petition therefore did not comply with section 122-2.

¶ 60    On this last point, it is interesting to note that, although the majority affirmatively holds that the unsworn Langford statement constitutes "other evidence" for purposes of the Act (*supra* ¶ 34), the majority does not appear to believe that this is really the case. Again, the majority's holding in this case is that defendant complied fully with section 122-2 because,

while not an "affidavit," the unsworn Langford statement is "other evidence." *Supra* ¶ 34. Nevertheless, the majority goes on to hold that the State may move to dismiss defendant's petition at the second stage on the grounds that the Langford statement is unsworn, and that defendant's continued failure to have it sworn would compel the granting of the State's motion. *Supra* ¶ 35. Forgive my confusion, but if the unsworn Langford statement is, as the majority insists, "other evidence," then how could defendant's continued reliance upon that statement possibly constitute grounds for dismissal at the second stage? Presumably, the State could not move to dismiss a petition at the second stage solely on the grounds that it is supported by a properly sworn affidavit. Nor could the State move to dismiss a petition at the second stage solely on the grounds that it is supported by records. Indeed, such petitions would be in full substantive compliance with the Act, and a motion to dismiss of the sort described would be nonsense. Why, then, could the State move to dismiss at the second stage solely on the grounds that the petition is supported by "other evidence"? Yet this is exactly what the majority is saying. In one breath, the majority is saying that the unsworn Langford statement is "other evidence" and that defendant's petition therefore complies with section 122-2 and may not be dismissed. In the next breath, the majority is saying that the State may move to dismiss defendant's petition at the second stage on the grounds that it is *not* supported by "other evidence" and therefore does *not* comply with section 122-2 and that, if nothing changes, the State's motion to dismiss must be granted. Which is it? Again, if the unsworn Langford statement is indeed "other evidence," then defendant's continued reliance upon it at stage two could not possibly constitute grounds for dismissal, as "other evidence" is precisely what the Act demands of him. Conversely, if the unsworn Langford statement does not constitute "other evidence" at stage two, then it never constituted "other evidence" to begin with and summary dismissal is appropriate. This is the exact point I have been making, and in its own way, the majority appears to be making it, too.

¶ 61    As if this were not enough, the majority's conclusion that the unsworn Langford statement is "other evidence" also runs directly contrary to the *ejusdem generis* doctrine, which provides that, when a statutory clause specifically describes several classes of persons or things and then includes "other persons or things," the word "other" is interpreted to mean "other such like." *People v. Davis*, 199 Ill. 2d 130, 138 (2002). That is exactly the situation we have here. Section 122-2 requires that a postconviction petition have attached to it "affidavits, records, or other evidence." Likewise, section 122-6 states that "[t]he court may receive proof by affidavits, depositions, oral testimony, or other evidence." 725 ILCS 5/122-6 (West 2008). Under the *ejusdem generis* doctrine, this court must presume that, when the legislature used the phrase "other evidence," it meant other evidence *like* affidavits, records, depositions, and oral testimony. So then what do these specified classes of evidence have in common? What they have in common is they are all classes of evidence that may be used to prove contested facts in a legal proceeding.[3] In other words, they are classes of *admissible* evidence. Thus, under the *ejusdem generis* doctrine, the phrase "other evidence" must mean other classes of *admissible* evidence, which again is the point I've been making. And measured by this standard, the unsworn Langford statement utterly fails, as even the majority concedes that the unsworn Langford statement is wholly inadmissible. By contrast, the majority's position turns the

---

[3]In *People v. Rose*, 48 Ill. 2d 300, 302 (1971), this court specifically held that "depositions" under section 122-6 refers only to evidence depositions and not to discovery depositions.

- 17 -

*ejusdem generis* doctrine on its head by holding that the "other evidence" allowed for in sections 122-2 and 122-6 need not bear any resemblance whatsoever to the specified classes of evidence that come before. Indeed, as construed by the majority, section 122-2 may as well read "affidavits, records, *or anything else*," and section 122-6 may as well read "affidavits, depositions, oral testimony, *or anything else*," as that is exactly the import of saying that "other evidence" includes "unsworn factual statements" that are neither "admissible" nor "competent." *Supra* ¶ 37. I am certain that this is not what the legislature intended, and in any event it is utterly incompatible with the long-settled *ejusdem generis* doctrine.

¶ 62    On a related point, I am also troubled by the majority's express finding that "the circuit court may not dismiss at the first stage solely for failure to notarize a statement *styled as an evidentiary affidavit*." (Emphasis added.) *Supra* ¶ 34. This is a remarkable holding, as it elevates form over substance to a nearly unprecedented degree. To "style" something means simply to "title" or "caption" it. Black's Law Dictionary 1560 (9th ed. 2009); see also Webster's Third New International Dictionary 2271 (1993) (defining "style" alternatively as "designate," "term," "name," "call"). Thus, according to the majority, so long as a postconviction petition has attached to it something *titled* "affidavit," that petition is effectively immune from summary dismissal. And this is true even if the actual *substance* of the attachment bears no resemblance whatsoever to an actual affidavit. From now on, at stage one, the *caption* controls. Now presumably, the majority will object to my characterization of its holding on the grounds that, in the sentence following the one quoted above, it adds:

> "Instead, the circuit court at the first stage must look to whether the evidentiary attachments satisfy the purposes identified in *Collins* and *Delton*: showing the petition's allegations are capable of corroboration and identifying the sources, character, and availability of evidence alleged to support the petition's allegations." *Supra* ¶ 34.

If this is consolation, it is hollow consolation. Again, we have already established that, under this court's settled case law, an "unsworn factual statement" of the sort filed by defendant in this case is an inadmissible and unreliable "legal nullity" that has "no legal effect." Indeed, from an evidentiary standpoint, filing an "unsworn factual statement" where an "affidavit" is called for is exactly the same as filing nothing at all. *Secura*, 232 Ill. 2d at 216. So if an "unsworn factual statement" can pass the majority's test, which is precisely what the majority holds in this case (*supra* ¶ 34), then I think it is safe to say that *anything* can pass the majority's test—provided, of course, that it bears the caption "affidavit." Make no mistake, the caption does indeed control, and stage two is now available simply for the styling.

¶ 63    Before moving on from this issue, I would note that, near the end of its "other evidence" analysis, the majority confesses that its conclusion concerning the evidentiary value of the unsworn Langford statement is motivated at least in part by its inability to understand a policy that would allow for the summary dismissal of petitions containing defective evidence but disallow the summary dismissal of petitions containing an explanation as to why such evidence is defective. Thus, the majority explains:

> "under *Collins*, defendant's petition would have advanced to the second stage, as long as he explained that Langford had authored the statement supporting the allegations in the petition but that the statement could not be notarized due to the lack of a notary. It is difficult to understand how an explanation of the difficulty of finding a notary within

- 18 -

the prison—a difficulty the court can readily surmise—would convert the instant petition from being frivolous or patently without merit to being potentially meritorious." *Supra* ¶ 37.

I would like to help the majority along in its understanding. To begin with, the policy that the majority describes arises not "under *Collins*" but rather under the plain language of section 122-2, which states:

"The petition shall have attached thereto affidavits, records, or other evidence supporting its allegations *or shall state why the same are not attached*." (Emphasis added.) 725 ILCS 5/122-2 (West 2008).

As for "how an explanation of the difficulty of finding a notary within the prison *** would convert the instant petition from being frivolous or patently without merit to being potentially meritorious," the answer to that can be found in this court's settled canons of statutory construction. When construing a statute, this court's primary goal is to ascertain and give effect to the legislature's intent. *Moore v. Chicago Park District*, 2012 IL 112788, ¶ 9. We seek that intent first from the plain language of the statute and, if that language is clear and unambiguous, we are not at liberty to depart from its plain meaning. *Id*. Thus, the answer to the majority's question as to "how an explanation of the difficulty of finding a notary within the prison *** would convert the instant petition from being frivolous or patently without merit to being potentially meritorious" is that this is what section 122-2 says. *Supra* ¶ 37. Whether we "understand" or approve of the policy set forth in section 122-2 is immaterial, as, absent a constitutional infraction, it is not this court's job to second-guess a legislative determination that a law is desirable or necessary. See *People v. Kohrig*, 113 Ill. 2d 384, 397 (1986).

¶ 64                                    Procedural Defect

¶ 65    Moving on from the "other evidence" question, I would now like to address the majority's assertion that the failure to have a section 122-2 affidavit sworn to under oath amounts to a "procedural" rather than a substantive defect in the postconviction petition. According to the majority, "[w]here a defendant has submitted an unnotarized statement, the State may challenge this *nonjurisdictional procedural defect* at the second stage of proceedings." (Emphasis added.) *Supra* ¶ 35. At another place, the majority characterizes a section 122-2 affidavit's lack of notarization as a "remediable procedural defect." *Supra* ¶ 36. Of course, the majority's choice of such language is no accident, as characterizing the lack of notarization as a "procedural defect" allows the majority to invoke *Hommerson*'s observation that, "at the first stage of proceedings, the court considers the petition's substantive virtue rather than its procedural compliance." *Hommerson*, 2014 IL 115638, ¶ 11. And in fact, this is exactly what the majority does. *Supra* ¶ 33.

¶ 66    The problem with the majority's approach is that, in relation to both the Langford statement itself and defendant's use of that statement in support of his postconviction petition, the fact that the statement is unsworn is clearly a substantive, rather than a procedural, defect. As to the unsworn Langford statement itself, the majority asserts that "lack of notarization *** does not prevent the court from reviewing the petition's 'substantive virtue,' as to whether it 'set[s] forth a constitutional claim for relief.' " *Supra* ¶ 33 (quoting *Hommerson*, 2014 IL 115638, ¶ 11). In fact, according to the majority, lack of notarization is a mere "procedural defect" that "does not limit" or "destroy" a statement's ability to function as evidence. *Supra*

¶¶ 34, 36. In other words, according to the majority, being sworn to under oath is a mere procedural step in the creation of an affidavit, the absence of which has no substantive impact on the statement's evidentiary efficacy. This position finds no support in *Roth*, and it is utterly contrary to everything *Roth* has to say about affidavits.

¶ 67        Again, *Roth* is crystal clear: being sworn to under oath is not a mere procedural step in the creation of an affidavit. On the contrary, it is the defining substantive feature of an affidavit. The issue in *Roth* was whether an unsworn statement signed by the defendant's attorney was sufficient to satisfy Supreme Court Rule 315(b)'s affidavit requirement. In holding that it absolutely was not, this court doubled-down on the principle that, to be an "affidavit," the statement in question simply *must* be made under oath and sworn to before someone who has authority under the law to administer oaths. Indeed, the court could not have been any clearer on this point, stating it multiple times and in multiple ways, both positively and negatively. Noting that "Illinois courts have defined ['affidavit'] in consistent fashion for over 100 years," the court first explained that " '[a]n affidavit is simply a declaration, *on oath*, in writing, *sworn to by a party before some person who has authority under the law to administer oaths.*' " (Emphases added.) *Roth*, 202 Ill. 2d at 493 (quoting *Harris v. Lester*, 80 Ill. 307, 311 (1875)). From there, the court reiterated that principle, this time adding the obvious corollary that " ' "[a] writing which does *not* appear to have been sworn to before any officer does *not* constitute an affidavit." ' " (Emphases added.) *Id.* at 493-94 (quoting *People v. Smith*, 22 Ill. App. 3d 377, 380 (1974), quoting 2 Ill. L. and Prac. *Affidavits* § 2, at 648 (1953)). And then, just for good measure and to ensure that there would be no remaining confusion on this point, the court *again* emphasized that "an affidavit *must be sworn to*, and statements in a writing *not sworn to* before an authorized person *cannot be considered affidavits*." (Emphases added.) *Id.* at 494. Notably, this all occurred in the course of a single paragraph, the conclusion of which was the court's express holding that "[the] defendant did not file an 'affidavit' in this case *because the document filed with the appellate court does not consist of a statement sworn to before a person who has authority under the law to administer oaths.*" (Emphasis added.) *Id.*

¶ 68        Now admittedly, immediately following its discourse on the meaning of "affidavit," the court in *Roth* was compelled to acknowledge its recent decision in *Robidoux v. Oliphant*, 201 Ill. 2d 324 (2002), which held that an unsworn affidavit *was* sufficient to comply with Supreme Court Rule 191(a)'s affidavit requirement. In doing this, however, the court went out of its way to explain that *Robidoux* was a singular case that turned not on the century-old definition of "affidavit" but rather on the unusual language contained in Rule 191(a). Specifically, the court noted that, rather than simply require the filing of an "affidavit," Rule 191(a) expressly enumerates what is required of the affidavits filed pursuant to that rule, stating that such affidavits:

> "shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all documents upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013).

The court then explained that, "[b]ecause Rule 191(a) sets out specific requirements for an affidavit, but omits reference to notarization, it was reasonable for this court to conclude in

*Robidoux* that notarization is not required." *Roth*, 202 Ill. 2d at 496. As importantly, the court in *Roth* then emphasized both that "our analysis in *Robidoux* necessarily applies *only to affidavits filed pursuant to Rule 191(a)*" and that, where the provision at issue "gives absolutely no guidance as to what is required of the party filing the affidavit," the "requirements must be gleaned from our case law, *i.e.*, how this court has traditionally viewed the requirements of an affidavit." (Emphasis added.) *Id*. at 495, 496. And how the court "has traditionally viewed the requirements of an affidavit" is that an affidavit that is not sworn is a "nullity" that "has no legal effect." *Id*. at 496, 497.

¶ 69    Thus, far from being a mere procedural step in the creation of an affidavit, being sworn to under oath is the defining and essential substantive feature of an affidavit. It simply is not possible, then, as the majority does, to dismiss the unsworn Langford statement's lack of notarization as a mere "procedural defect" that does not "limit" or "destroy" the statement's ability to function as evidence. *Supra* ¶ 34. Under *Roth*, the fact that the Langford statement was not sworn to under oath not only precludes it from *being* an affidavit in the first place but also makes it a "nullity" with "no legal effect," which is a substantive defect if ever there was one.

¶ 70    In the same way, the fact that the Langford statement is unsworn is not a mere "procedural defect" in defendant's postconviction petition, such that *Hommerson* controls. On the contrary, it is a substantive defect that, under this court's decision in *Collins*, mandates summary dismissal.

¶ 71    At this point, it is worth reviewing the important difference between *Collins* and *Hommerson*, as doing so will demonstrate that *Hommerson* has absolutely no role to play in deciding the present controversy. *Collins* arose under section 122-2 of the Act, which is concerned solely with the *substance* of a postconviction petition. Titled "Contents of Petition," section 122-2 provides that:

> "The petition shall identify the proceeding in which the petitioner was convicted, give the date of the rendition of the final judgment complained of, and clearly set forth the respects in which petitioner's constitutional rights were violated. The petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached. The petition shall identify any previous proceedings that the petitioner may have taken to secure relief from his conviction. Argument and citations and discussion of authorities shall be omitted from the petition." 725 ILCS 5/122-2 (West 2012).

Contrary to the requirements of this provision, the defendant in *Collins* filed a *pro se* postconviction petition that was unsupported by affidavits, records, or other evidence and offered no explanation for the absence of such documentation. *Collins*, 202 Ill. 2d at 66 (quoting 725 ILCS 5/122-2 (West 2008)). The trial court summarily dismissed the *pro se* petition, and this court affirmed. In doing so, this court explained that the failure to comply with section 122-2 is "fatal" to a postconviction petition and "alone justifies" summary dismissal. *Id.*

¶ 72    *Hommerson*, by contrast, arose under section 122-1(b) of the Act, which outlines how a postconviction proceeding "shall be commenced":

> "The proceeding shall be commenced by filing with the clerk of the court in which the conviction took place a petition (together with a copy thereof) verified by affidavit.

Petitioner shall also serve another copy upon the State's Attorney by any of the methods provided in Rule 7 of the Supreme Court. The clerk shall docket the petition for consideration by the court pursuant to Section 122-2.1 upon his or her receipt thereof and bring the same promptly to the attention of the court." 725 ILCS 5/122-1(b) (West 2012).

In *Hommerson*, the defendant filed a *pro se* postconviction petition alleging ineffective assistance of counsel. Although the petition was supported by several section 122-2 affidavits, defendant did not verify the petition prior to filing it, as required by section 122-1(b). The trial court summarily dismissed the *pro se* petition, and this time the court reversed. In doing so, the court explained that "at the first stage of proceedings, the court considers the petition's substantive virtue rather than its procedural compliance." 2014 IL 115368, ¶ 11.

¶ 73        Properly understood, then, *Collins* and *Hommerson* are two very different cases. *Collins* arose under a *substantive* provision of the Act (section 122-2), and it held that the failure to comply with that provision is a *substantive defect* in the petition itself that justifies summary dismissal at the first stage. *Hommerson*, by contrast, arose under a *procedural* provision of the Act (section 122-1), and it held that the failure to comply with that provision is a *procedural defect* that does *not* justify summary dismissal at the first stage. And if there is any doubt that this is what distinguishes these two cases, simply consider that this court has continued both to cite and to apply *Collins* long after announcing that, at the first stage of proceedings, a court considers only the petition's "substantive virtue" and not its "procedural compliance." Indeed, though the majority cites *Hommerson* for this principle, it was actually first announced by the court in *People v. Boclair*, which was decided only a few months after *Collins*. See *People v. Boclair*, 202 Ill. 2d 89, 102 (2002). Significantly, in the 13 years since *Boclair* was announced, this court has continued to cite *Collins* for the principle that failing to comply with section 122-2 justifies summary dismissal at the first stage. See, *e.g.*, *People v. Harris*, 224 Ill. 2d 115, 126 (2007) (citing *Collins* for the principle that "[t]he failure to comply with section 122-2 is fatal and by itself justifies the petition's summary dismissal"); *People v. Hall*, 217 Ill. 2d 324, 332 (2005) (same); see also *People v. Delton*, 227 Ill. 2d 247, 255 (2008). In light of the now long-settled principle that, at the first stage, a court considers a postconviction petition's "substantive virtue" rather than its "procedural compliance," this court's continued adherence to *Collins* necessarily means that the failure to comply with section 122-2 is a *substantive* defect in the petition itself rather than a mere "procedural shortcoming." Otherwise, summary dismissal for such a failure would be impermissible.

¶ 74        Why does this matter? It matters because defendant in this case wholly failed to comply with section 122-2. Again, that section expressly states that "[t]he petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2012). Here, the only thing attached to defendant's petition was the unsworn Langford statement, which we already established is a "nullity" that "has no legal effect." *Roth*, 202 Ill. 2d at 497. Again, it is exactly the same as if defendant filed nothing at all. *Secura*, 232 Ill. 2d at 216. Consequently, just like the petition in *Collins*, defendant's petition here had none of the supporting documentation that section 122-2 requires. This being the case, the trial court below was absolutely correct to dismiss defendant's petition summarily, and this court should not hesitate to affirm that dismissal.

## Public Policy

As a final matter, I wish to note that the majority's decision today will have grave public policy implications going forward. Prior to today, to survive first-stage review, a postconviction petition had to be supported by an *actual* affidavit, meaning it had to be supported by a statement sworn to under oath before a person who has authority under the law to administer oaths. This was important because, in addition to being what section 122-2 expressly requires, actual affidavits serve an important gatekeeping function, in that actual affidavits bear reliable indication that the person *purporting* to make the statement is the person *actually* making the statement. See *Vancura v. Katris*, 238 Ill. 2d 352, 367 (2010); 5 ILCS 312/6-102 (West 2012). After today, actual affidavits are no longer necessary. After today, to survive first-stage review, a postconviction petition's attachment need only bear the caption "affidavit," at which point the attachment need not be sworn, need not be notarized, and need not bear any indication that the person purporting to make the statement is the person actually making the statement. In other words, after today, and so long as it says "affidavit" at the top, a document that an inmate can generate alone in his or her own cell, make say anything he or she wants, and attribute to anyone he or she deems helpful, will be sufficient to ensure that the inmate's postconviction petition survives first-stage review and that the matter advances to second-stage proceedings, complete with the appointment of counsel. This is a dramatic lowering of section 122-2's pleading requirements, and it has the very real potential to overwhelm our circuit courts with frivolous second-stage proceedings. Nothing in our law compels this, and I therefore decline to join the majority in establishing it.

For all of these reasons, I dissent.

JUSTICE KARMEIER joins in this dissent.