2020 IL App (1st) 171098-U

THIRD DIVISION
December 23, 2020

No. 1-17-1098

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | 07 CR 24440 (01) |
| | ) | |
| JAMES HALE, | ) | Honorable |
| | ) | Allen F. Murphy, |
| Petitioner-Appellant. | ) | Judge Presiding |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: Reversed and remanded. Petitioner stated gist of claim for ineffective assistance of counsel at first stage of postconviction proceedings.

¶ 2    Petitioner, James Hale, pleaded guilty to one count of first-degree murder. In 2017, he filed a postconviction petition claiming actual innocence, ineffective assistance of counsel, and "suppression of evidence." At first-stage review, the circuit court dismissed the petition as frivolous and patently without merit. On appeal, petitioner argues that his claim of ineffective assistance of counsel was sufficient to survive first-stage review.

¶ 3    We agree.  Though not a model of draftsmanship, taken as true, the postconviction petition stated the gist of a claim of ineffective assistance of counsel—specifically, that

petitioner's trial counsel failed to investigate an alibi witness whose testimony would have exonerated petitioner, despite petitioner having given counsel the name of the alibi witness and his contact information, and thus petitioner's guilty plea was not voluntarily and intelligently made. We reverse the trial court's judgment and remand for second-stage proceedings.

¶ 4                                        BACKGROUND

¶ 5        The underlying crime involves the November 3, 2005 murder of Shantiel Clark. Shantiel was killed by gunshots fired into a Chevy Lumina in which she was a passenger—shots that were fired by multiple individuals from an SUV that pulled up alongside the Lumina on south Pulaski Avenue in Chicago, at around 10:00 to 10:30 pm.

¶ 6        Because petitioner's prosecution ended in a pretrial plea, we have no trial transcript from which to draw the facts. We have the prosecution's factual basis for the plea, of course, which, in fairness to the State, hits only the highlights of the State's proof. Fortunately, we have more information from other sources.

¶ 7        First, petitioner attached to his postconviction petition an unpublished order of this Court in the matter of *People v. Garrett*, 405 Ill. App. 3d 1197 (Table), No. 1-08-2309 (unpublished order under Supreme Court Rule 23) (December 15, 2010). That decision involved the prosecution of another person likewise convicted of Shantiel's murder, Tony Garrett. It is worth noting at the outset that this court reversed Tony Garrett's conviction and remanded for a new trial, based on trial errors in a case where we deemed the evidence "closely balanced" in part "[b]ecause of the unreliability of the State's witnesses." *Id*. at 16. (As we will see, those same witnesses were part of the State's factual basis for the guilty plea in petitioner's case.)

¶ 8    Second, we source another appellate opinion, this one involving petitioner's case, where the State took a pretrial, interlocutory appeal after the trial court ruled that certain other-crimes evidence was inadmissible at petitioner's trial. See *People v. Hale*, 2012 IL App (1st) 103537.[1]

¶ 9                    I. Background Leading to Petitioner's Charge

¶ 10    That said, we start by restating the basic facts: Shantiel was in the back seat of a Chevy Lumina, one of three occupants in that vehicle, headed south on Pulaski Avenue on November 3, 2005, when an SUV pulled up alongside the Lumina, and several occupants of the SUV opened fire. Shantiel, who was pregnant at the time, was struck and died from the gunshot wounds.

¶ 11    Over the next two years, several people were charged with the murder.

¶ 12    The driver of the Lumina, William Jackson, initially identified three men as the shooters: Tony Garrett as the driver, and two occupants, Donyall Garrett and Myron Orr.  Tony and Donyall Garrett were arrested and charged the next day. But Orr was never charged because he had an airtight alibi: "he was in jail in Iowa at the time of the shooting." *Garrett*, No. 1-08-2309, at 2. And prosecutors later dropped the charges against Donyall Garrett. *Id*. at 3, 15.

¶ 13    William Jackson later recanted his identification of Tony Garrett in two different affidavits and in a statement he made to Tony's then-lawyer. Nevertheless, Jackson testified at Tony Garrett's trial that Tony was the driver of the SUV involved in the shooting. *Id*. at 3. He testified that, while he initially identified the other two individuals, "later he realized Donyall was not there, just as he later realized he had mistakenly identified Orr." *Id*.

---

[1] Our opinion in *Hale*, 2012 IL App (1st) 103537, ¶ 3, refers to the murder of Shantiel as occurring on November 11, 2005, but it is clear from the indictment in this case, the State's factual basis for petitioner's guilty plea, and our unpublished order in *Garrett*, that the crime actually happened on November 3, 2005.  This is important to keep in mind because the alibi affidavits we will discuss later are based on the date of November 3.

¶ 14    The third passenger in the Lumina was Michael Smith. At Garrett's trial, Smith "testified that he, too, saw Tony [Garrett] driving the SUV, and Smith also saw Donyall [Garrett] in the SUV." *Id*. at 4. As we later noted, however, Smith "had a very limited opportunity to see the shooter before he ducked in the car." *Id*. at 16.

¶ 15    But Michael Smith is relevant for another reason, too—there was an attempt on his life because he implicated Tony Garrett in Shantiel's murder. In fact, the State also charged Tony Garrett, in that same trial, with attempting to murder Smith.  (And as we will see, in its factual basis for petitioner's guilty plea in our matter, the State claimed that petitioner was part of that plot, too.)

¶ 16    The third primary witness against Tony Garrett was an individual named Keyonte McDowell, an informant who "came forward and provided more details about Shantiel's shooting." *Hale*, 2012 IL App (1st) 103537, ¶ 5.  (As we will see, Keyonte McDowell was the first and only eyewitness to implicate petitioner, along with another man named Randy Rice, in Shantiel's murder.)

¶ 17    We described McDowell's testimony, as it related to Shantiel's murder, as follows:

> "Keyonte McDowell testified that after 11 p.m. on November 3, 2005, about an hour after the murder, he saw Tony [Garrett], Donyall [Garrett], [petitioner] and another man get out of a white Cadillac. The four men went to [petitioner]'s home. McDowell went over to [petitioner's] home to find out what happened. He saw Tony sitting with a .40 caliber gun in his lap. A .9 millimeter gun and a third gun lay on a table. Tony said, 'damn, *** she was messed up.' Tony added that he 'ain't know it was a girl,' and he 'thought it was Mario inside the car.' Tony said that once he saw [William] Jackson in the car, he told everyone to stop shooting." *Garrett*, No. 1-08-2309, at 2.

¶ 18    McDowell also testified that he was part of a group, with petitioner and Donyall Garrett, that later tried to murder Michael Smith for implicating Tony in Shantiel's murder. *Id*. at 2-3.

¶ 19    McDowell testified pursuant to a plea agreement that we described as follows:

> "Prosecutors agreed to reduce one attempted murder charge against McDowell to aggravated battery, and they recommended a sentence of two years' probation in exchange for his guilty plea and his testimony against Tony. The State helped McDowell move by giving him rent money, and the State also gave McDowell money for food and clothing. The State's payments to McDowell totaled about $800. Prosecutors also dropped a charge against McDowell for violating his probation, and they never charged him for his failed attempt to kill Smith." *Id*. at 5.

¶ 20    In reviewing various trial errors for plain error, we concluded that the evidence against Tony Garrett was closely balanced. *Id*. at 16. We noted that, while both William Jackson and Michael Smith identified Garrett as the driver of the SUV and one of the shooters, the witnesses "gave the jurors some reason to doubt the identifications," most notably Jackson's varying and contradictory identifications and recantations. *Id*. at 15-16. We noted that McDowell's testimony included an admission by Tony Garrett that he shot Shantiel, in a case of mistaken identity, but we also wrote that "jurors could doubt McDowell's testimony because the State bought that testimony at such a high price." *Id*. at 16. And "[t]he fact that the State charged neither McDowell nor Donyall with attempting to murder Smith could indicate to a juror that prosecutors, too, found McDowell's testimony not entirely reliable." In sum, we determined, "[b]ecause of the unreliability of the State's witnesses, the lack of physical evidence, and the contradiction of most of the evidence by defense witnesses, we find the evidence in this case closely balanced." *Id*.

¶ 21                                    II. Charges Against Petitioner

¶ 22    Based on the information provided by Keyonte McDowell, petitioner, along with Randy

Rice, was arrested for Shantiel's murder. *Hale*, 2012 IL App (1st) 103537, ¶ 5. "[Petitioner] and

Rice each gave a detailed confession." *Id.*

¶ 23    Petitioner told the police that a man named Mario had previously robbed and attacked

Tony Garrett. On the night of November 3, Tony  gathered petitioner and Rice to seek retaliation

against Mario. *Id.* "As they were driving southbound on Pulaski Road, they spotted William's

car, which they thought contained Mario. [Petitioner] stated that several people from Tony's car

began to shoot at William's car, but his gun jammed. [Petitioner] stated that after the shooting,

Tony drove away." *Id.*

¶ 24    Before trial, petitioner moved to suppress that statement; the trial court denied that

motion. The trial court also denied the State's motion to admit other-crimes evidence, namely

two alleged acts of petitioner: (1) attempted murder of another individual only an hour or so

before Shantiel's murder and (2) the attempted murder of Michael Smith for implicating Tony

Garrett in Shantiel's murder. The State took an interlocutory appeal of the trial court's ruling,

and we reversed in a 2-1 decision, holding that the other-crimes evidence should be admitted at

petitioner's trial. *Id.* ¶ 36.

¶ 25                                    III. Petitioner's Plea

¶ 26    After his failed motion to suppress and his defeat on appeal regarding the other-crimes

evidence, petitioner pleaded guilty to one count of murder and received a sentence of 30 years in

prison. His plea was entered on January 16, 2014.

¶ 27    The State recited the following factual basis for the plea: First, Michael Smith and

William Jackson would have testified that they were driving in the Lumina with Shantiel on

November 3, 2005, when an SUV pulled up alongside their car and the occupants opened fire. Shantiel was hit with gunfire and died from her wounds.

¶ 28    Second, Keyonte McDowell would have testified that on the evening in question, he was at the house of one of petitioner's relatives. Petitioner, Randy Rice, Tony Garrett, and other individuals were present. McDowell saw Rice and petitioner with guns and heard them mention a shooting that had occurred on Pulaski Avenue.

¶ 29    Third, in terms of other-crimes evidence, McDowell would testify that Tony Garrett asked McDowell and Donyallto shoot Michael Smith. They agreed and got a gun. Petitioner drove McDowell and his brother to Chicago Heights to find Smith. McDowell and his brother approached Michael and produced a firearm, but when an officer drove by, everyone fled.

¶ 30    Finally, Officer Fred Nowaczyk would have testified that, after being *Mirandized*, petitioner made statements implicating himself, Garrett, and Rice in the shooting of the car containing Shantiel.

¶ 31                              IV. Postconviction Petition

¶ 32    Three years after his guilty plea, petitioner filed this postconviction petition. The petition raises three claims: actual innocence, "suppression of evidence," and ineffective assistance of counsel. Though the petition was dismissed in its entirety, petitioner only challenges the dismissal of the ineffectiveness claim on appeal. We thus limit ourselves to a consideration of that claim.

¶ 33    In sum, the relevant portion of the postconviction petition alleges that petitioner did not shoot Shantiel, nor was he present for the shooting; he was asked to join the individuals who went out that night to shoot a rival gang member, but he refused to go; they threatened his life for refusing to go; he fled out of fear for his life; he and another individual hid at his house for the

remainder of that night; he gave his defense lawyer the name and contact information for his alibi witness; but his lawyer failed to investigate the alibi or contact the witness. As a result, the petition alleges, petitioner pleaded guilty to a crime he did not commit.

¶ 34    More specifically, the postconviction petition contained five affidavits, two from petitioner. In the first of those two, petitioner merely swore to the truth of the statements made in the petition itself. There were four substantive affidavits.

¶ 35    One affidavit came from Tony Garrett. He swore that, on November 3, 2005 around 7:30 p.m., he and petitioner were held at gunpoint by Keyonte McDowell, James Cozzi, and Lavell Word. These individuals wanted petitioner and Garrett to go with them to shoot a member of a rival drug gang. When petitioner refused to go, McDowell told Word to take petitioner somewhere and kill him, after which they would blame the shooting on petitioner. Word took petitioner out of sight at gunpoint. Around 10:30 p.m., Garrett drove Cozzi, Word, and McDowell to 147th and Pulaski in Garrett's car, all the while with McDowell holding a gun on him. Cozzi, McDowell, and Word fired the shots into William Jackson's car that killed Shantiel. Afterward, McDowell told all of them to blame the incident on petitioner.

¶ 36    Petitioner swore in his substantive affidavit that he was actually innocent of the shooting of Shantiel, and that he only made statements to the police, and later pleaded guilty, out of fear of gang retaliation. In November 2016, while they were both incarcerated, Tony Garrett confided in him that there was a plan by Keyonte McDowell to pin Shantiel's murder on him petitioner. He stated that he could not have discovered this information sooner because of the fear of gang retaliation.

¶ 37    Darryl Lipscomb's affidavit stated that, on November 3, 2005 around 8:00 p.m., he saw petitioner run out the front door of a home at 13920 S. Grace in Robbins, IL. Petitioner crossed

the street and asked Lipscomb to hide him because there were men trying to kill him. Lipscomb saw that petitioner was frightened and took petitioner back to petitioner's house at 21820 S. Peterson Ave in Sauk Village. Lipscomb and petitioner stayed there until 11:00 p.m. (Recall that Shantiel was shot somewhere around 10:00 to 10:30 pm.)

¶ 38     The final affidavit attached to the post-conviction petition was from a paralegal investigator named Eugene Horton, who stated that he investigated the case from September 2016 to January 2017, that he had discovered new evidence, and that the other affiants had been afraid to come forward due to a threat of gang retaliation.

¶ 39     Those are the affidavits. In the petition itself, handwritten in all caps, petitioner made several claims regarding ineffective assistance of counsel. On appeal, he focuses on this one: "Defense counsel failed to investigate his alibi defense, despite defendant informing defense counsel of the alibi witness address, name and phone number." The ineffectiveness portion of the petition concludes:

> "But for counsel's failure, the factual statement of the guilty plea was insufficient, misleading and false; a defense worthy of a judge or jury consideration was concealed; the plea was involuntary because of wrongful inducement by the state; and, a different result at trial would have occured [*sic*]."

¶ 40     During first-stage review, the circuit court dismissed the petition. It found that "[i]n his application for post-conviction relief [petitioner] alleges a claim of actual innocence but his affidavit does not support that claim. It it [*sic*] is an alibi. Furthermore, it is a plea of guilty. For those reasons I find that the petition is frivolous and without merit." The court did not address the ineffectiveness claim (or the "suppression of evidence" claim) and dismissed the petition.

¶ 41     Petitioner timely appeals.

¶ 42                                    ANALYSIS

¶ 43    On appeal, petitioner argues the circuit erred when it dismissed his petition at the first stage because he has sufficiently alleged a claim for ineffective assistance of counsel. He does not make arguments with respect to the other two claims. We review the summary dismissal of a postconviction petition *de novo*. *People v. Tate*, 2012 IL 112214, ¶ 10.

¶ 44    The Post-Conviction Hearing Act, 725 ILCS 5/122-1, *et seq.* (Act) provides a process for criminal defendants to challenge their convictions due to a substantial denial of their constitutional rights. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). This process is separated into three distinct stages. *People v. Clark*, 2011 IL App (2d) 100188, ¶ 15. During the first stage, the circuit court reviews the petition to determine whether it is frivolous or patently without merit. *Id.*; 725 ILCS 5/122-2.1(a)(2) (West 2016).

¶ 45    A petition is frivolous or patently without merit "only if the petition has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 16. A petition lacks an arguable basis in law or fact if it is based on "an indisputably meritless legal theory or a fanciful factual allegation." *Id.* "Meritless legal theories include ones completely contradicted by the record, while fanciful factual allegations may be 'fantastic or delusional.' " *People v. Allen*, 2015 IL 113135, ¶ 25. At the first stage, the court must accept the factual allegations of the petition as true and construe them liberally, drawing all reasonable inferences in favor of the petitioner. *Id.*

¶ 46    A postconviction claim of ineffective assistance of counsel is governed by the principles established in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Brown*, 2017 IL 121681, ¶ 25. A defendant must establish that his counsel's performance fell below an objective standard of reasonableness and that he was prejudiced by counsel's deficient performance. *Id.* As with other first-stage petitions, one claiming ineffective assistance is judged by the lower first-

stage pleading standard. *Tate*, 2012 IL 112214, ¶ 20. An ineffective assistance petition may not be dismissed " 'if (i) it *arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) it is *arguable* that the defendant was prejudiced.' " (Emphasis in original.) *Id.* ¶ 19 (quoting *Hodges*, 234 Ill. 2d at 17).

¶ 47     We begin with the claim of deficient performance. In the context of a guilty plea, an attorney's conduct is deficient if the attorney fails to ensure that the defendant's guilty plea was voluntary and intelligent. *People v. Hall*, 217 Ill. 2d 324, 335 (2005); *People v. Rissley*, 206 Ill. 2d 403, 457 (2003). As a general rule, an attorney's decisions to call witnesses are trial strategy and do not support a claim of ineffective assistance. See *Clark*, 2011 IL App (2d) 100188, ¶ 25.

¶ 48     But "[t]rial counsel has a professional duty to conduct 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *People v. Domagala*, 2013 IL 113688, ¶ 38 (quoting *Strickland*, 466 U.S. at 691). And when "counsel had reason to know, from an objective standpoint, that a possible defense *** was available, failure to investigate fully can constitute ineffective assistance of counsel." (Internal quotation marks omitted.) *Id.* "In particular, 'the failure to interview witnesses may indicate incompetence when trial counsel knows of the witness and their testimony may be exonerating.' " *Clark*, 2011 IL App (2d) 100188, ¶ 26 (quoting *People v. Bell*, 152 Ill. App. 3d 1007, 1012 (1987)).

¶ 49     Here, the petition includes an affidavit of Lipscomb, an alibi witness. Lipscomb swore that he saw petitioner running from a home, in fear of his life, and that Lipscomb and petitioner hid at petitioner's house until a time of the evening that would have made it impossible for petitioner to have been part of the shooting that killed Shantiel. And petitioner swore that he gave the contact information of Lipscomb to his attorney before trial, but his attorney failed to

follow up on that lead. Taken as true, as it must be at this stage, these allegations easily show the gist of a claim of deficient performance.

¶ 50    Petitioner cites *People v. Clark*, 2011 IL App (2d) 100188, ¶ 5, where Clark pleaded guilty to attempted murder for stabbing his girlfriend multiple times. He filed a postconviction petition claiming, among other things, "that his counsel was ineffective because she coerced him to plead guilty under the false impression that there were no witnesses available to testify on his behalf" regarding the possible defense of insanity. *Id*. ¶ 8. In fact, his girlfriend had been willing to testify to his diminished capacity and even tried unsuccessfully to contact the petitioner's defense attorney. *Id*. ¶ 9. The defense attorney "had Clark plead guilty under the belief that no witnesses were available, which was 'false and misleading information to rely on in making his decision to plead guilty.'" *Id*. The trial court dismissed the petition at the second stage. *Id*. ¶ 10.

¶ 51    We found these allegations sufficient to satisfy the higher second-stage standard for alleging deficient performance. That is, "Clark made a substantial showing that his counsel failed to investigate a witness who could have provided evidence that, as a result of mental disease, Clark lacked substantial capacity to appreciate the criminality of his conduct" and thus that "counsel was deficient in failing to investigate [Clark's girlfriend] as a witness who could support an insanity defense." *Id*. ¶ 28.

¶ 52    Our case is different in ways that both help and hurt petitioner's claim. The allegations in *Clark* were a bit more on the nose, as the petition there alleged not only that counsel failed to investigate a helpful witness, but also that defense counsel pressured the petitioner to plead guilty on the false assumption that Clark had no witnesses to support an insanity defense. Here, the failure to investigate is plainly alleged, but petitioner does not come out and state that his lawyer did anything in particular to coerce his plea or cause him to plead guilty.

- 12 -

¶ 53    On the other hand, we found the petition in *Clark* at the second stage of proceedings, where the petitioner has the benefit of counsel and the correspondingly higher burden of "mak[ing] a substantial showing of a constitutional violation." *Hall*, 217 Ill. 2d at 334. Here, in contrast, at the first stage, petitioner need only show the "gist" of a claim—that his claims have an arguable basis in law and fact, claims that are neither meritless nor delusional. *Hodges*, 234 Ill. 2d at 16; *Allen*, 2015 IL 113135, ¶ 25.

¶ 54    Whatever we may say about this petition drafted by a *pro se* prisoner, we cannot say that its allegations of deficient performance are meritless or delusional, or that they lack any basis in law or fact. The petition, to be sure, does not dot every "i" and cross every "t." The allegations are *almost* sufficient on their own to state a claim for deficient performance, but not quite.

¶ 55    That is to say, the petition more than sufficiently alleges (1) the existence of an alibi witness; (2) that petitioner told his lawyer about that witness, down to his name and contact information; and (3) that his lawyer never followed up on the matter. What the petition does *not* allege is how counsel's failure led to petitioner not voluntarily and intelligently entering his plea of guilty—which as we have said, ultimately is the point of a *Strickland* claim in the context of a guilty plea. See *Hall*, 217 Ill. 2d at 335 ("An attorney's conduct is deficient if the attorney failed to ensure that the defendant's guilty plea was entered voluntarily and intelligently.").

¶ 56    For example, did the lawyer tell petitioner that the alibi defense was a non-starter? Did the lawyer tell petitioner that he wouldn't investigate that lead? Was there something else about counsel's failure that led petitioner to lose hope and plead guilty to a crime he did not commit? We typically require some such allegation before advancing a petition, at least beyond the second stage. See, *e.g.*, *Clark*, 2011 IL App (2d) 100188, ¶ 8 (allegation that defense counsel coerced petitioner to plead guilty, claiming incorrectly that petitioner had no supporting

witnesses, stated claim for deficient performance at second stage); *Hall*, 217 Ill. 2d at 335 (counsel's erroneous legal advice, that petitioner had no defense based on lack of knowledge and thus should plead guilty, when in fact petitioner had valid defense of lack of knowledge, "establishe[d] a substantial showing that his attorney's advice was objectively unreasonable" at second-stage postconviction proceedings).

¶ 57    The most we have here is the petition's allegation that "[b]ut for counsel's failure, *** a defense worthy of a judge or jury consideration was concealed ***." That may get in the ballpark, but it is not enough. Ultimately, petitioner would have to make some allegation tying his attorney's deficiency to a claim that he did not voluntarily and intelligently plead guilty.

¶ 58    Still, that is not a basis for dismissal at the first stage. The first stage is set up in recognition that most petitions are drafted by prisoners without legal training, and thus the standard is necessarily low. See *Allen*, 2015 IL 113135, ¶ 24 ("Most postconviction petitions are drafted by *pro se* defendants, and accordingly, the threshold for a petition to survive the first stage of review is low."); accord *Hodges*, 234 Ill. 2d at 9. The first stage is to weed out claims that have no chance—that are frivolous or obviously meritless. This petition's claims of deficient performance are not perfect, but they are clearly not frivolous.

¶ 59    The State challenges the sufficiency of the allegations of an alibi, not because the Lipscomb affidavit was insufficient but because petitioner's affidavit did not corroborate it: "[D]efendant, himself, has failed to specify what his alibi actually is. Nowhere in his post-conviction petition, or in his own affidavit, does defendant provide any specific details about his whereabouts before, during or after the instant offense. Thus, it is not clear if Lipscomb's potential testimony was consistent with defendant's own version of events."

¶ 60    We reject that argument. If the allegations in the Lipscomb affidavit are taken as true, as they must be, petitioner had a valid alibi defense. We are aware of no requirement in the law that petitioner's affidavit repeat or corroborate those allegations, and the State cites to none. We would add, though it is not required, that the petition, itself, states that petitioner told his lawyer about an alibi witness and cited to Lipscomb's affidavit, and statements in the petition were verified by a separate affidavit signed by petitioner. So even if petitioner did not himself spell out the details of the alibi, he incorporated them by reference. That is more than what is required.

¶ 61    Beyond that argument, the State takes a different tack, claiming that the allegations are contradicted by the record. It is true, as we mentioned above, that a legal theory may be deemed without merit at the first stage if the record positively rebuts the claim. See *Allen*, 2015 IL 113135, ¶ 25 ("Meritless legal theories include ones completely contradicted by the record"). In several ways, says the State, the record contradicts petitioner's claim of deficient performance.

¶ 62    For one, the State points to the portion of the record where petitioner pleaded guilty and confirmed that he was doing so without any threats or coercion:

> "THE COURT: Has anyone threatened you or promised you anything other than this agreement to get you to plea guilty today?
>
> MR. HALE: No.
>
> THE COURT: Are you pleading guilty of your own free will?
>
> MR. HALE: Yes."

¶ 63    It is true that petitioner was properly admonished and indicated that he was not coerced or threatened. That was also true in *Clark*, 2011 IL App (2d) 100188, ¶ 6, where the court asked, and defendant affirmed, three times that his plea was voluntary. It was also true in *Hall*, 217 Ill. 2d at 327-28, where the petitioner twice told the court he was pleading guilty of his own free

will. In each of those cases, the court nevertheless reversed the dismissal and ordered the cause advanced to a third-stage hearing. Nor, for that matter, do we think it automatically follows that petitioner, having made the decision to plead guilty, would not accept responsibility for that decision and state that he was making it of his own free will—even if the reason he did so was that his lawyer gave him faulty or discouraging legal advice regarding the alibi defense. The colloquy above and the allegations of deficient performance are not necessarily antithetical.

¶ 64    The State likewise notes that petitioner never complained to the trial court that his lawyer was failing to do his job properly. Also true; the record reveals no such complaint. That would be a fine response to petitioner at a third-stage hearing, where issues of credibility may be raised, but by no means is petitioner's silence in front of the judge a complete rebuttal of his current claim, which we take as true, that his lawyer fell down on the job, nor has the State cited any case law for that proposition.

¶ 65    Finally, the State blames petitioner for his lawyer's failure to investigate the alibi witness: The record, says the State, "indicates that defendant did not want his case to be continued any longer. To the contrary, defendant requested to 'get it done today as opposed to delaying this any further.' Thus, having explicitly expressed his desire to plead guilty 'today' without any further delay, defendant should not be allowed to come back to court several years later and claim that trial counsel was ineffective for failing to adequately investigate Lipscomb."

¶ 66    In other words, though the petition alleges that petitioner pleaded guilty because counsel didn't investigate his alibi, the State is saying that counsel didn't investigate his alibi because petitioner pleaded guilty. But the State can't possibly know that from a single remark by counsel (not petitioner). Petitioner had obviously made the weighty, consequential decision to plead guilty, to spend the next thirty years in prison. The mere fact that, once he had made that

decision, he wanted to get the hearing over with, is not nearly enough information for us to leap to the conclusion the State wishes. And that is to say nothing of the fact that the case, by the time of the guilty plea, had lingered for quite some time, including a substantial delay for interlocutory appellate review of the trial court's ruling on the admissibility of other-crimes evidence. To ask us to conclude, from this record, that petitioner put such a rush on his lawyer that he didn't have the chance to investigate the alibi defense, is not asking us to liberally construe this petition but to read it as strictly as possible against petitioner.

¶ 67    Finally, the State asks us to consider the circumstances surrounding the guilty plea. For one, things had gone badly for petitioner up to that point: his motion to suppress his inculpatory statement to the police had been denied, and the appellate court had ruled that other-crimes evidence could be used against him. For another, in the State's view, petitioner got a pretty good plea deal, as the minimum sentence for first-degree murder involving the use of a firearm is forty-five years in prison, but the State amended the charge to remove any reference to a firearm, thereby avoiding the mandatory 25-year enhancement, so the plea could be for thirty years.

¶ 68    The State has correctly laid out the factual circumstances and sentencing ranges surrounding petitioner's guilty plea. But none of that "completely contradict[s]" (*Allen*, 2015 IL 113135, ¶ 25) petitioner's claim here that his lawyer failed to follow up on a viable defense, and that is why, or at least one of the reasons why, he pleaded guilty. We will not prejudge that credibility determination at the first stage of proceedings.

¶ 69    For these reasons, the petition adequately alleged deficient performance.

¶ 70    A petitioner claiming a *Strickland* violation must also allege prejudice. *Brown*, 2017 IL 121681, ¶ 25. In the context of a guilty plea, he must allege that, absent counsel's alleged failure to investigate, defendant would have demanded a trial. *Hall*, 217 Ill. 2d at 335; *Brown*, 2017 IL

121681, ¶ 26. But a bald assertion that the petitioner would have insisted on a trial, absent counsel's deficient performance, is not enough. *People v. Hughes*, 2012 IL 112817, ¶ 65. Rather, the petitioner must allege *why* it would have been " 'rational under the circumstances' " to reject the plea agreement he accepted. *Id*. (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010)). The petitioner, in other words, must assert either a claim of actual innocence or a plausible defense he could have raised at trial. *Id*. ¶ 64; *Hall*, 217 Ill. 2d at 335-36; *Rissley*, 206 Ill. 2d at 458-59.

¶ 71     The petition here alleges both. Petitioner swears in his own affidavit, as do two others in their affidavits, that petitioner was not part of the shooting of Shantiel. The petition also alleges a viable defense by way of the alibi witness's testimony. Taking the allegations as true, the petition easily establishes a rational reason to reject the plea offer and insist on going to trial.

¶ 72     The petition thus adequately alleged a claim of ineffective assistance, at least sufficient to survive a first-stage dismissal. The judgment of the circuit court is reversed.

¶ 73     Finally, we take note that petitioner did not appeal the dismissal of his actual-innocence claim. We make no comment on the merits of that claim. We do note that our supreme court just recently decided the question of whether a defendant who pleads guilty may raise an actual-innocence claim, a question that had divided our appellate courts. Compare *People v. Reed*, 2019 IL App (4th) 170090, ¶ 26 (guilty plea forecloses postconviction petition for actual innocence) with *People v. Shaw*, 2019 IL App (1st) 152994, ¶ 44 (petitioner who pleaded guilty may later file actual-innocence petition). Our supreme court has recently clarified that "defendants who plead guilty may assert an actual innocence claim" under the Post-Conviction Hearing Act. *People v. Reed*, 2020 IL 124940, ¶ 41.

¶ 74    Here, the trial court suggested that the claim of actual innocence—the only one of the three claims it addressed—was faulty because of petitioner's guilty plea.  The supreme court's recent decision has obviously shown that reasoning to be incorrect.

¶ 75                                        CONCLUSION

¶ 76    The judgment of the circuit court is reversed. This cause is remanded to advance the petition for second-stage proceedings.

¶ 77    Reversed and remanded.