2024 IL App (1st) 230672-U

No. 1-23-0672

Order filed November 18, 2024

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 22079 |
| | ) | |
| LARRY AUSTIN, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justice Cobbs concurred in the judgment.
Justice Pucinski specially concurred.

**ORDER**

¶ 1    *Held*:  Circuit court's dismissal of defendant's postconviction petition at the second stage affirmed where counsel complied with Supreme Court Rule 651(c) and provided reasonable assistance.

¶ 2    Defendant Larry Austin appeals from the second-stage dismissal of his petition filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). On appeal, defendant contends that postconviction counsel did not provide reasonable assistance

where counsel failed to amend the postconviction petition to support defendant's claims of ineffective assistance of trial counsel and actual innocence. We affirm.

¶ 3    Defendant was charged with first degree murder (720 ILCS 5/9-1(a)(1), (a)(2), (West 2008)) and armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2008)) in connection with the shooting of Ranus Hall on October 25, 2008. At trial, defendant asserted a theory of self-defense. Following a jury trial, defendant was convicted of first degree murder and sentenced to 45 years in prison. We affirmed on direct appeal. *People v. Austin*, 2016 IL App (1st) 121446-U.

¶ 4    The following facts are adopted from our order on direct appeal.

¶ 5    Around 5 a.m. on October 25, 2008, defendant shot Hall outside of the Kings and Queens Social Club (club) located at 5th Avenue and Pulaski Road, in Chicago, Illinois. Defendant did not deny shooting Hall but asserted that he did so in self-defense.

¶ 6    Devell Riley, Hall's cousin, testified that defendant approached him, Nyreele Tate, Terrence Conner, and Hall outside of the club.[1] After a brief verbal exchange between defendant and Hall, defendant retrieved a chrome-colored firearm from his pocket, aimed it at Hall—who put his hands in the air—and "started shooting." On cross-examination, Devell admitted that he heard shots from another firearm within seconds after defendant shot Hall. On redirect, Devell denied that he had a firearm on him, or that any of his friends had one, at the time of the shooting.

¶ 7    Tate, Hall's "close friend," testified that defendant approached him, Hall, and Devell outside the club. Tate asked defendant if he was "okay." Defendant retorted, " 'Who the f* * * is you?' " and asked for a "hit" of Devell's cigar. After defendant smoked the cigar a bit, he dropped

---

[1] Because Devell Riley shares the same last name as a proposed witness mentioned in defendant's postconviction petition, we refer to him by his first name.

it on the ground and walked away. As Tate left his friends to talk to a young woman, he heard gunfire. He looked back and observed Hall running toward him, trying to get away from defendant. Defendant was the only person Tate observed with a firearm during the incident.

¶ 8 Conner, also a cousin of Hall, testified that he was outside the club when defendant approached Devell and took "a hit off" of his cigar before dropping it on the ground. After Tate picked up the cigar, defendant reacted by saying, "Where did my black go?" Conner recalled defendant saying something that prompted Hall to respond, "we're not on that, we're tired, we just came from the club." Defendant then drew his firearm and started shooting. According to Conner, Hall "tried to like pat the gun down" or knock it down, and then ran from defendant. Defendant ran after Hall and continued to shoot. Conner saw defendant enter a white, four-door vehicle in the club's parking lot and heard more shots, but they did not come from defendant. Conner did not know where the additional gunfire came from.

¶ 9 Cassandra Austin, defendant's cousin, testified that she had gone to the club with her aunt, Catherine Austin, and Catherine's friend, Marcus Grant.[2] Grant drove them to the club in his white, four-door vehicle. On their way inside, Cassandra saw defendant leaving. Later, Cassandra heard gunshots but did not see who fired. Upon hearing the shots, she ran to Grant's vehicle and saw Catherine and Grant running toward her. Catherine was "hollering and screaming like 'Come on, let's go, they shooting.' " After the three of them reached the vehicle, Catherine yelled at defendant to enter the vehicle, "saying that was him had a gun." In response, Cassandra said to Catherine, " 'If he got a gun and he's shooting, what he getting in the car with us for?' " When Cassandra

_____

[2] Because Cassandra and Catherine share the last name, we will refer to them by their first names.

saw defendant approaching the vehicle, she jumped out of the vehicle and "ran home" because she was afraid of him. She did not see him again that night.

¶ 10    Cassandra was presented with her statement, which was prepared by assistant state's attorney (ASA) Robert Holland during her interview at the police station on October 26, 2008, the day after the shooting. According to the statement, Cassandra reported that prior to exiting Grant's vehicle, she had seen defendant standing over a young black male while aiming a firearm at him and yelling " 'I'll shoot you in the head if you don't shut the f* * * up.' " However, Cassandra testified that she did not give a statement to any ASA and denied ever reporting that she saw defendant standing over a male threatening to shoot him in the head. While she acknowledged that the signature and initials contained in the statement were hers, she explained that she "was kind of tired" during the interview and "initial[ed] like a lot of stuff without going over it because it was like frustrating."

¶ 11    ASA Holland testified that he memorialized Cassandra's statement in writing at the police station on October 26. After ASA Holland and Cassandra talked for approximately 15 minutes, she agreed to let him write down her statement. Cassandra told him that as Grant pulled his vehicle out of the club parking lot a bit, she could see the front of the club and saw defendant "standing over a boy pointing a handgun at the boy who had his hands over his head." Defendant was yelling, " 'I'll shoot you in the head if you don't shut the f* * * up .' " ASA Holland testified that those were Cassandra's "exact words." After completing the statement, ASA Holland and Cassandra "went through the statement line by line" before they signed the bottom of the page and initialed all changes in the statement.

¶ 12    Catherine, defendant's aunt, testified that she saw defendant leaving the club when she arrived. They spoke briefly before Catherine entered the club. Later, as she was leaving, she "started hearing shots." She and Grant entered his vehicle and, upon noticing defendant, yelled at him to enter the vehicle. As defendant entered, Cassandra "jumped out" of the vehicle. Catherine heard more gunshots after defendant was inside the vehicle. At her house, Catherine called the police and met the officers on the street. She then directed them to defendant, who was on her porch. She stated that she "thought that they [were] just going to let him go sleep the liquor off."

¶ 13    When asked if she had told the police that defendant had been involved in a shooting, Catherine said, "I don't know. They said I said that but, like I said, I was drunk. I really don't recall * * * I could have, I could not. I don't quite remember everything." The State then confronted Catherine with her prior grand jury testimony that she told the 911 dispatcher "that [defendant] may have been in a shooting on 5th and Pulaski." Catherine responded, "I don't remember like everything they asked and everything I said. I don't remember."

¶ 14    Chicago police department officers Nicholas Garcia and Victor Perez each testified that on the morning of October 25, 2008, they were waved down by Catherine near her residence. According to Officer Perez, Catherine told them that defendant "had a gun and that he was the person shooting at the club after an altercation." Afterward, Catherine directed the officers to her front porch, where they found defendant. When the officers arrested him, defendant had no weapons on him. Later, Officer Garcia recovered a "live bullet" from defendant's "rear pants pocket" during a search at the police station.

¶ 15    Defendant testified that he shot Hall because he "was scared for [his] life" and Hall "had a gun." The day before the shooting, defendant was at home, where he lived with Catherine and her

three kids. He and his girlfriend, Alexis, had spent the day together at the house and drank alcohol. Around 12 a.m. on October 25, Alexis went to the club, indicating she would return two hours later. After Alexis did not return home around the time she said she would, defendant called her but was unable to convince her to come home from the club. Alexis's stepfather, Leroy, drove to the club "with the understanding" that he would wait until defendant found Alexis to "bring her home."

¶ 16    Defendant brought a firearm to the club and kept it in his right jacket pocket. He testified that as the club was in a different neighborhood than the one in which he lived, he had concerns "[b]ecause of the gangs and the violence that was associated" with that neighborhood. According to defendant, if a person is "considered a stranger [in the neighborhood], * * * they could convey you as an enemy." Therefore, he brought the firearm as protection. After arriving with Leroy, defendant looked for Alexis inside and outside of the club. He stayed inside for about 45 minutes and at closing time, having still not found Alexis, he went outside and stood in front of the club, hoping to catch her as she left.

¶ 17    Defendant testified that as he stood outside, he saw "four, five guys standing by [him]." One asked him "what's up and where was [he] from." Defendant explained that, from past experience, he understood that to mean "a person was getting hostile." In 1996, during a visit to his grandmother, a group of males had "walked up" on him and "asked [him] the same question." During that incident, after defendant told them where he was from, they jumped him, "putting [him] in the hospital for two weeks." Here, defendant was nervous about having an exchange with a group of strangers, but told the group he was from "the village."

¶ 18    According to defendant, when he "turned back around, the guy in the black hoodie, which was [Hall], was reaching out with his left hand to grab [him]." Defendant testified that as Hall reached out with his left hand, Hall "was upping up a black handgun out of his right pocket." Hall made contact with defendant, and defendant thought Hall "was fittin' to hurt" him. Defendant explained that as he tried to push Hall with his left hand, he "upped the gun out of [his] right pocket * * * and fired one shot" at Hall.

¶ 19    After defendant fired the one shot, Hall "walked off like at a fast pace." When Hall turned back toward defendant, defendant "fired at him approximately two to three more times" because he thought Hall was "fittin' to turn back on me and fire back at me." After that, defendant saw Hall run down the block.

¶ 20    At this point, defendant stopped and stood on the street for a while. He could not see Alexis or Leroy and he did not know how he would leave the neighborhood. As he stood there, "two of the guys that was right there in that circle they started walking towards" him. Defendant did not want them approaching him "because I didn't want to fire the gun again," but then defendant heard Catherine call him. He ran toward her and entered the vehicle. More shots were fired from behind the club, but defendant did not see who was firing. Defendant testified that he did not plan on shooting Hall when he took the firearm with him to the club. He did not know Hall before the shooting and did not have any "beef" with Hall. In addition, defendant denied smoking or dropping anyone's cigar in front of the club.

¶ 21    Defendant testified that while he was at the police station, he lied to the police because he did not "want to go to jail for something [he] feel[s] that [he] didn't initiate." Therefore, he told the police he was home all evening and had not gone out.

¶ 22    On cross-examination, defendant said the firearm he brought to the club was not his; rather, he took it from Catherine's back yard. The firearm was already loaded, but defendant put an additional bullet in his pocket. He did not get rid of the firearm after the shooting. As far as he knew, it was in his jacket pocket when he dropped the jacket on the ground at the house and when the police arrested him. The police put the jacket on defendant right before he entered the police car. The last time he saw the firearm, it was in the right front pocket of the jacket.

¶ 23    Defendant admitted that he did not tell the police he shot Hall in self-defense. After he participated in the lineups, the police brought him into a separate room. He spoke to Detectives Bor and Jacobson and told them he had an alibi because he was at home on electronic monitoring. At some point, Detective Bor left defendant alone in the room, then returned and told defendant that they had investigated his alibi and knew it was false because the electronic bracelet's record showed that defendant had been away from home. Defendant conceded at trial that "[t]he whole thing was a lie that I told them," but he had maintained to the detectives that he was at home and that something was wrong with the electronic monitor. When speaking to the detectives, defendant insisted on this version of events even after they told him that the monitoring records showed defendant had been away from home all night, Catherine had placed him at the club between 2 a.m. and 5 a.m., and eyewitnesses had identified him in the lineups at the station.

¶ 24    The jury, which the court instructed on self-defense and second degree murder, found defendant guilty of first degree murder. Defendant filed a motion for a new trial, which the court denied. The court imposed a prison term of 45 years.

¶ 25    Defendant appealed, and we affirmed his conviction. *Austin*, 2016 IL App (1st) 121446-U.

¶ 26    Defendant subsequently filed a postconviction petition, arguing, *inter alia*, ineffective assistance of trial counsel. Specifically, defendant contended that trial counsel was ineffective for failing to investigate and call as a witness Quentin Davis, whom defendant alleged would have corroborated his theory of self-defense and undermined the State's case, so as to change the outcome of his trial. Defendant also argued that he attempted to obtain affidavits from Debra Riley and Grant but was unable to do so because he did not have the resources to locate their addresses without "assistance from the courts."[3]

¶ 27    Defendant attached an affidavit from Davis. Davis averred that on the night of the shooting, he observed Hall and Tate "get into" a verbal exchange with an individual he did not know. Hall reached for the individual with his left hand "while simutanously [*sic*] pulling his gun out of his pocket with his right hand." The individual then "upped" a firearm and shot at Hall once. Hall walked away but turned while swinging his arm, and the individual discharged the firearm at Hall approximately twice. Hall then attempted to run but fell, and the individual stood over Hall, slid Hall's firearm away from him, and then entered a vehicle. Tate retrieved Hall's firearm and discharged it towards the vehicle approximately five times. Davis remained on the scene and provided a detective with a handwritten statement detailing what he observed. Davis stated that no one contacted him after that. He would testify to what he told the detective at the scene.

¶ 28    Defendant also attached his own affidavit, alleging that he attempted to locate Debra, including contacting her at her last known address, but was unsuccessful. He also averred that "it was [his] belief" that Debra would state that she observed Hall "swing" at defendant prior to

_____

[3] Because Debra Riley shares the same last name as a trial witness, we will refer to her by her first name.

defendant shooting Hall, and she observed Tate retrieve a firearm from Hall and discharge it towards a white vehicle.

¶ 29    In another affidavit, defendant averred that he attempted to locate Grant "to sign an affidavit that would've stated" that Grant observed Hall "swing or lunge for defendant" before defendant retrieved the firearm. Defendant also asserted that Grant would state that defendant told Grant after the shooting that defendant was afraid, and "those guys started making trouble first." Defendant also stated that Grant observed an individual discharging a firearm toward Grant's vehicle. Defendant further claimed that Grant's affidavit would state that Grant did not tell "them the whole truth at first" because officers went to Grant's workplace and informed him that he could be charged as an accomplice after the fact if Grant admitted that he knew defendant discharged a firearm at Hall.

¶ 30    The court summarily dismissed defendant's petition as frivolous and patently without merit. Defendant appealed. This court reversed and remanded for second-stage proceedings, finding that defendant presented an arguable claim of ineffective assistance of trial counsel where counsel failed to investigate and present a witness who would have corroborated defendant's self-defense theory. *People v. Austin*, 2019 IL App (1st) 171481-U.[4]

¶ 31    On remand, postconviction counsel was appointed to represent defendant. On August 3, 2021, counsel filed a Rule 651(c) certificate, attesting that she (1) consulted with defendant "personally or by letter to [a]scertain his contentions of deprivations of constitutional rights"; (2) reviewed "any and/or all aspects of the Records of the proceedings of this case: Report of

---

[4] We note, for the sake of clarification, that this is the proper citation for this court's decision reversing and remanding defendant's second-stage proceeding.  However, that decision is only accessible on Westlaw using the slightly different styling of *People v. Austin*, 2019 Il App (1st) 17-1481.

Proceedings; Common Law Records; Supplementals and Trial Exhibits; Plea Transcripts and/or any Prior Mandates provided to me concerning Indictment Number 08-CR-2207901"; (3) "reviewed the court file looking specifically for any and all Pre-trial Motions for discovery and Motions for a New Trial"; (4) "obtained and examined any plea transcript and sentencing, if applicable, in this case"; and (5) did not file an amended postconviction petition because defendant's *pro se* petition "adequately set forth *** [defendant's] claims of deprivation of his constitutional rights."[5] At a hearing on defendant's petition, counsel informed the court that she received a letter from defendant where he disagreed with her filing of the Rule 651(c) certificate. The court advised counsel that she could amend the certificate if necessary.

¶ 32    At another hearing, counsel informed the court that "after having a conversation with Mr. Davis," she found it "most appropriate" for his affidavit to be "withdrawn from consideration of this postconviction." Counsel further stated that she sent defendant a letter advising him of such, but defendant had not responded. Following counsel's oral amendment to the petition, the court asked counsel if the Rule 651(c) certificate needed amending, and counsel stated she "[did not] think so."

¶ 33    The State then filed a motion to dismiss defendant's postconviction petition, arguing, *inter alia*, that defendant's claim that trial counsel was ineffective for failing to investigate or call Debra and Grant as witnesses at trial and his claim of actual innocence were without merit because defendant did not attach affidavits from Debra and Grant.

---

[5] We note that the Rule 651(c) certificate included in the record on appeal is not file-stamped, but during a hearing on defendant's petition, the parties informed the court that the certificate was filed on August 3, 2021. Neither party raises this as an issue on appeal.

¶ 34    At a subsequent hearing, postconviction counsel informed the court that she would not file a response to the State's motion. At the hearing on the State's motion to dismiss, postconviction counsel only argued that defendant "feels that he should have received a different sentence and is seeking a new sentence." On March 21, 2023, the court issued a 10-page order granting the State's motion to dismiss defendant's postconviction petition, noting that defendant failed to make a substantial showing of a violation of his constitutional rights.

¶ 35    Defendant now appeals, solely contending that he was denied reasonable assistance of postconviction counsel in violation of Supreme Court Rule 651(c) (eff. July 1, 2017), where counsel failed to amend the postconviction petition to support defendant's claims of ineffective assistance of trial counsel and actual innocence. Specifically, defendant contends that counsel failed to investigate and obtain affidavits from Debra and Grant to support his petition.

¶ 36    The Act allows a criminal defendant to challenge a conviction for violations of federal or state constitutional rights, or both. *People v. Jean*, 2024 IL App (1st) 220807, ¶ 28. The defendant's petition must "clearly set forth the respects" in which the defendant's constitutional rights were violated and "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-1(b) (West 2020). Affidavits or other evidence are required to establish that the allegations in the petition are " 'capable of objective or independent corroboration.' " *People v. Allen*, 2015 IL 113135, ¶ 24 (quoting *People v. Collins*, 202 Ill. 2d 59, 79 (2002)). "The affidavits which accompany a post-conviction petition must identify with reasonable certainty the sources, character and availability of alleged evidence supporting petitioner's allegations." *People v. Johnson*, 154 Ill. 2d 227, 240 (1993). A postconviction petition which is not supported by affidavits or other supporting

documents is subject to dismissal without an evidentiary hearing "unless the petitioner's allegations stand uncontradicted and are clearly supported by the record." *Id.*

¶ 37 A postconviction proceeding occurs in three stages. *People v. Joiner*, 2024 IL 129784, ¶ 17. The circuit court here dismissed defendant's petition at the second stage. Dismissal of a postconviction petition at the second stage is only warranted where the allegations in the petition fail to make a substantial showing of a constitutional violation. *Jean*, 2024 IL App (1st) 220807, ¶ 28. Additionally, at the second stage, counsel is appointed to represent an indigent defendant and may amend the petition if necessary, and the State may file responsive pleadings. *People v. Cotto*, 2016 IL 119006, ¶ 27. During second-stage proceedings, a defendant is entitled to a "reasonable" level of assistance from postconviction counsel (*People v. Urzua*, 2023 IL 127789, ¶ 56), which is "significantly lower than the one mandated at trial by our state and federal constitutions" (*People v. Custer*, 2019 IL 123339, ¶ 30).

¶ 38 To ensure the reasonable assistance standard is met, Rule 651(c) imposes three duties on postconviction counsel. *People v. Huff*, 2024 IL 128492, ¶ 22. Postconviction counsel must (1) consult with the defendant to ascertain the contentions of deprivations of constitutional rights, (2) examine the record of the trial proceedings, and (3) make any "necessary" amendments to the *pro se* petition "for an adequate presentation of [the defendant's] contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017). "If amendments to a *pro se* postconviction petition would only further a frivolous or patently nonmeritorious claim, they are not 'necessary' within the meaning of the rule." *People v. Greer*, 212 Ill. 2d 192, 205 (2004); see also *People v. Kirk*, 2012 IL App (1st) 101606, ¶ 21 ("counsel's decision not to amend a defendant's *pro se* petition has been held not to

constitute a deprivation of adequate representation where [the defendant's] claim lack[ed] a sufficient factual basis").

¶ 39 Rule 651(c) ensures that counsel "shapes the [defendant's] claims into proper legal form and presents those claims to the court." *People v. Perkins*, 229 Ill. 2d 34, 43-44 (2007). A rebuttable presumption of reasonable assistance is created upon postconviction counsel's filing of a Rule 651(c) certificate. *Custer*, 2019 IL 123339, ¶ 32. The defendant bears the burden to overcome this presumption by demonstrating that counsel failed to "substantially comply with the duties mandated by Rule 651(c)." *People v. Profit*, 2012 IL App (1st) 101307, ¶ 19. We review both the dismissal of a postconviction petition at the second stage and counsel's compliance with Rule 651(c) *de novo. Id.* ¶ 17.

¶ 40 In the present case, defendant acknowledges that postconviction counsel filed a certificate in compliance with Rule 651(c). Defendant does not dispute that counsel consulted with him or examined the record; rather, he contends that postconviction counsel provided unreasonable assistance when she did not comply with Rule 651(c) and amend the *pro se* petition. Defendant specifically contends that counsel failed to investigate and obtain affidavits from Debra and Grant or, alternatively, amend the petition to substantiate a claim of actual innocence, specifically, that Debra and Grant had newly-discovered evidence.

¶ 41 Counsel's Rule 651(c) certificate established that she communicated with defendant regarding defendant's contentions of deprivation of constitutional rights, reviewed the report of proceedings, common law record, and supplemental and trial exhibits, and determined that defendant's *pro se* petition "adequately set forth *** [his] claims of deprivation of his constitutional rights." Counsel's certificate substantially complied with the requirements

delineated in Rule 651(c). Accordingly, we presume that postconviction counsel provided reasonable assistance (*Custer*, 2019 IL 123339, ¶ 32), and defendant bears the burden to rebut this presumption (*Profit*, 2012 IL App (1st) 101307, ¶ 19).

¶ 42    Defendant contends that counsel's failure to investigate and obtain affidavits from Debra and Grant rebuts the presumption that counsel provided reasonable assistance. Defendant emphasizes that without Debra's and Grant's affidavits, his petition was defective, and the dismissal of the petition was a "foregone conclusion." As noted, a petition not supported by affidavits is subject to dismissal without an evidentiary hearing unless the defendant's allegations stand "uncontradicted and are clearly supported by the record." *Johnson*, 154 Ill. 2d at 240.

¶ 43    Here, defendant's allegations are not uncontradicted or clearly supported by the record, and therefore, affidavits from Debra and Grant were necessary for his petition to survive dismissal. Defendant's *pro se* petition identified Debra and Grant as individuals from whom he attempted to obtain affidavits but asserted that he was unable to locate them. When counsel received this information, counsel was obligated to attempt to contact Debra and Grant and determine if their information would support defendant's claim (*Johnson*, 154 Ill. 2d at 248), and if so, attempt "to obtain affidavits for the purpose of shaping the allegations in the petition into appropriate legal form" (*People v. Rials*, 345 Ill. App. 3d 636, 642 (2003)). However, counsel is not obligated to "engage in a generalized fishing expedition in search of support for claims raised in a petition." *Johnson*, 154 Ill. 2d at 248. When a petition is not supported by affidavits or other evidentiary documents and there is no "affirmative evidence in the record to establish that postconviction counsel did not seek out and examine all available evidence relevant to [a] claim," this court "reasonably presume[s] postconviction counsel made a concerted effort to obtain evidence in

support of postconviction claims, but was unsuccessful." *People v. Wallace*, 2016 IL App (1st) 142758, ¶ 27; see also *Johnson*, 154 Ill. 2d at 241.

¶ 44    The record in this matter does not rebut the presumption that counsel made a concerted effort to investigate or obtain affidavits from Grant and Debra in support of defendant's postconviction claims. Defendant provides us, through his affidavits, with unsupported speculation regarding what he believed Debra and Grant would have testified to and the belief that they would have supplied affidavits helpful to him. However, there were no affidavits from Debra and Grant attached to the petition. Moreover, defendant points to no affirmative evidence in the record to establish that postconviction counsel failed to investigate Debra and Grant or make a concerted effort to obtain affidavits from them. At the hearing where counsel orally amended defendant's petition and withdrew Davis' affidavit, counsel informed the court that she had spoken with Davis to gain clarification on the facts in his affidavit. While counsel did not expressly state whether she spoke with Debra and Grant, defendant fails to identify any affirmative evidence that establishes that counsel failed to investigate them in an attempt to obtain affidavits. Accordingly, where the record provides no affirmative evidence to establish that postconviction counsel did not investigate and examine all available evidence relevant to defendant's claim, we "reasonably presume that postconviction counsel made a concerted effort to obtain evidence in support of postconviction claims, but was unsuccessful." *Wallace*, 2016 IL App (1st) 142758, ¶ 27.

¶ 45    In view of the presumption that counsel made a concerted effort to obtain affidavits from Debra and Grant, we find that defendant has failed to rebut the presumption that counsel provided reasonable assistance in compliance with Rule 651(c).

¶ 46     As to defendant's alternative argument that counsel failed to amend the petition to substantiate a claim of actual innocence, specifically, that Debra and Grant had newly-discovered evidence, we find that this argument is waived as defendant failed to fully develop this argument with citations to legal authority. *People v. Ballard*, 2022 IL App (1st) 210762, ¶ 25; see also Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020).

¶ 47     In sum, we find that defendant has failed to overcome the presumption that counsel provided reasonable assistance during second-stage proceedings.

¶ 48     The judgment of the circuit court of Cook County is affirmed.

¶ 49     Affirmed.

¶ 50     JUSTICE PUCINSKI, specially concurring:

¶ 51     I concur, but I see that defendant needed affidavits from two people, Debra Riley and Marcus Grant, and his postconviction counsel did not get them, he could not get them from prison, and his postconviction counsel never said she even tried but failed to get the two affidavits . . . defendant is in a classic catch-22! I concur ONLY because this is the way the Post-Conviction Hearing Act is written and we are stuck with it.